IN THE MATTER OF CLAIRE C. CONROY.

Argued March 19, 1984—Decided January 17, 1985.

322

332

*William I. Strasser* argued the cause for appellant, Thomas C. Whittemore, Guardian of Claire C. Conroy (*Donohue, Donohue, Costenbader & Strasser,* attorneys).

*John J. DeLaney, Jr.,* argued the cause *pro se* as respondent Guardian *ad Litem* for Claire C. Conroy (*John J. DeLaney, Jr.,* attorney; *Young, Rose & Millspaugh,* of counsel).

*Joseph H. Rodriguez,* Public Advocate, argued the cause *pro se* as intervenor-respondent (*Joseph H. Rodriguez,* attorney; *Herbert D. Hinkle,* Deputy Public Advocate and *Linda J. Robinson,* Assistant Deputy Public Advocate, on the briefs).

*Mary K. Brennan,* General Counsel, argued the cause for *amicus curiae* New Jersey Hospital Association (*Mary K. Brennan* and *Sterns, Herbert & Weinroth,* attorneys; *Frank J. Petrino* and *Richard M. Hluchan,* of counsel).

*Amelia H. Boss* submitted a brief on behalf of *amici curiae* former Commissioners and professional staff members of the President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research.

*Diane K. Smith* and *Toby S. Edelman,* a member of the District of Columbia bar, submitted briefs on behalf of *amicus curiae* National Citizens' Coalition for Nursing Home Reform (*Patrick N. Budd,* Director, Legal Aid Society of Mercer County, attorney).

*Stephen J. Foley* submitted briefs on behalf of *amici curiae* John R. Connery, S.J., William E. May, William Smith, Benedict Ashley, O.P., the Student Ad Hoc Committee Against the War in Vietnam and the New Jersey Concerned Taxpayers (*Campbell, Foley, Lee, Murphy & Cernigliaro,* attorneys).

*Charles C. Deubel, III,* submitted a brief on behalf of *amicus curiae* The American Geriatrics Society (*Deubel & Deubel,* attorneys).

*Elmer M. Matthews* submitted a brief on behalf of *amicus curiae* New Jersey Catholic Conference.

*Richard P. Maggi* and *Edward R. Grant,* a member of the Pennsylvania bar, submitted a brief on behalf of *amicus curiae* New Jersey Right to Life Committee, Inc. (*McDermott, McGee & Ruprecht,* attorneys).

*John E. Runnells, III,* submitted briefs on behalf of *amicus curiae* Concern for Dying.

The opinion of the Court was delivered by

SCHREIBER, J.

At issue here are the circumstances under which life-sustaining treatment may be withheld or withdrawn from incompetent, institutionalized, elderly patients with severe and permanent mental and physical impairments and a limited life expectancy.

Plaintiff, Thomas C. Whittemore, nephew and guardian of Claire Conroy, an incompetent, sought permission to remove a nasogastric feeding tube, the primary conduit for nutrients, from his ward, an eighty-four-year-old bedridden woman with serious and irreversible physical and mental impairments who resided in a nursing home. John J. DeLaney, Jr., Conroy's guardian *ad litem,* opposed the guardian's petition. The trial

court granted the guardian permission to remove the tube, and the Appellate Division reversed.

I

In 1979 Claire Conroy, who was suffering from an organic brain syndrome that manifested itself in her exhibiting periodic confusion, was adjudicated an incompetent, and plaintiff, her nephew, was appointed her guardian. The guardian had Ms. Conroy placed in the Parkview Nursing Home, a small nursing facility with thirty beds. There she came under the care of Dr. Kazemi, a family practitioner, and Catherine Rittel, a registered nurse, who was the nursing home administrator. Upon her admission, Ms. Conroy, although confused, could converse and follow directions, was ambulatory, and was in relatively good physical condition. Thereafter, she became increasingly confused, disoriented, and physically dependent.

Ms. Conroy was hospitalized on two occasions at Clara Maas Hospital, once between July 23, 1979 and August 8, 1979, for dehydration and a urinary tract infection, and later between July 21, 1982 and November 17, 1982, for an elevated temperature and dehydration. During the latter hospitalization the diagnostic evaluation showed that Ms. Conroy had necrotic gangrenous ulcers on her left foot. Two orthopedic surgeons recommended that to save her life, her leg should be amputated. However, her nephew refused to consent to the surgery because he was confident that she would not have wanted it. Contrary to the doctors' prognosis, Ms. Conroy did not die from the gangrene.

During this second hospitalization, Dr. Kazemi observed that Ms. Conroy was not eating adequately, and therefore, on July 23, he inserted a nasogastric tube that extended from her nose through her esophagus to her stomach. Medicines and food were then given to her through this tube. On October 18, the tube was removed, and Ms. Conroy was fed by hand through her mouth for two weeks. However, she was unable to eat a

sufficient amount in this manner, and the tube was reinserted on November 3.

When Ms. Conroy was discharged from the hospital to the nursing home on November 17, 1982, the tube was left in place. It continued to be used for the same purposes thereafter. A second attempt to feed Ms. Conroy through her mouth about January, 1983 failed because Ms. Conroy was incapable of swallowing sufficient amounts of nutrients and water. According to the testimony of Dr. Kazemi, Ms. Conroy had such difficulty swallowing that even a person with great time and patience could probably not have coaxed her into absorbing enough fluids and solid food by mouth to sustain herself.

At the time of trial, Ms. Conroy was no longer ambulatory and was confined to bed, unable to move from a semi-fetal position. She suffered from arteriosclerotic heart disease, hypertension, and diabetes mellitus; her left leg was gangrenous to her knee; she had several necrotic decubitus ulcers (bed sores) on her left foot, leg, and hip; an eye problem required irrigation; she had a urinary catheter in place and could not control her bowels; she could not speak; and her ability to swallow was very limited. On the other hand, she interacted with her environment in some limited ways: she could move her head, neck, hands, and arms to a minor extent; she was able to scratch herself, and had pulled at her bandages, tube, and catheter; she moaned occasionally when moved or fed through the tube, or when her bandages were changed; her eyes sometimes followed individuals in the room; her facial expressions were different when she was awake from when she was asleep; and she smiled on occasion when her hair was combed, or when she received a comforting rub.

Dr. Kazemi and Dr. Davidoff, a specialist in internal medicine who observed Ms. Conroy before testifying as an expert on behalf of the guardian, testified that Ms. Conroy was not brain dead, comatose, or in a chronic vegetative state. They stated, however, that her intellectual capacity was very limited, and

that her mental condition probably would never improve. Dr. Davidoff characterized her as awake, but said that she was severely demented, was unable to respond to verbal stimuli, and, as far as he could tell, had no higher functioning or consciousness. Dr. Kazemi, in contrast, said that although she was confused and unaware, "she responds somehow."

The medical testimony was inconclusive as to whether, or to what extent, Ms. Conroy was capable of experiencing pain. Dr. Kazemi thought that Ms. Conroy might have experienced some degree of pain from her severely contracted limbs, or that the contractures were a reaction to pain, but that she did not necessarily suffer pain from the sores on her legs. According to Dr. Davidoff, it was unclear whether Ms. Conroy's feeding tube caused her pain, and it was "an open question whether she [felt] pain" at all; however, it was possible that she was experiencing a great deal of pain. Dr. Davidoff further testified that she responded to noxious or painful stimuli by moaning. The trial court determined that the testimony of a neurologist who had examined Ms. Conroy would not be necessary, since it believed that it had sufficient evidence about her medical condition on which to base a decision.

Both doctors testified that if the nasogastric tube were removed, Ms. Conroy would die of dehydration in about a week. Dr. Davidoff believed that the resulting thirst could be painful but that Ms. Conroy would become unconscious long before she died. Dr. Kazemi concurred that such a death would be painful.

Dr. Kazemi stated that he did not think it would be acceptable medical practice to remove the tube and that he was in favor of keeping it in place. As he put it, "she's a human being and I guess she has a right to live if it's possible." Ms. Rittel, the nurse, also thought the tube should not be removed since in her view it was not an extraordinary treatment. The nursing home had taken no position on the subject.

Dr. Davidoff said that if he had been the treating physician and the case had not come to court, he would have removed the tube with the family's consent. In his opinion, although Ms. Conroy seemed to be receiving excellent care, she did not have long to live, perhaps a few months. In those circumstances, he considered nasogastric feeding an extraordinary, or optional, medical treatment, because it went "beyond the necessities of life." He analogized the nasogastric tube to a respirator that supplies oxygen and said that since Ms. Conroy was "hopelessly ill with no possibility of returning to any sort of cognitive function, in the face of possibly [sic] suffering taking place at the moment," he could recommend that the feeding tube be removed.

Ms. Conroy had lived a rather cloistered life. She had been employed by a cosmetics company from her teens until her retirement at age 62 or 63. She had lived in the same home from her childhood until she was placed in the nursing home, had never married, and had very few friends. She had been very close to her three sisters, all of whom had died.

Ms. Conroy's only surviving blood relative was her nephew, the guardian, Thomas Whittemore. He had known her for over fifty years, had visited her approximately once a week for four or five years prior to her commitment to the nursing home, and had continued to visit her regularly at the nursing home for some time. The record contained additional evidence about the nephew's and aunt's financial situations and the history of their relationship. Based on the details of that record, there was no question that the nephew had good intentions and had no real conflict of interest due to possible inheritance when he sought permission to remove the tube.

Mr. Whittemore testified that Ms. Conroy feared and avoided doctors and that, to the best of his knowledge, she had never visited a doctor until she became incompetent in 1979. He said that on the couple of occasions that Ms. Conroy had pneumonia, "[y]ou couldn't bring a doctor in," and his wife, a registered

nurse, would "try to get her through whatever she had." He added that once, when his wife took Ms. Conroy to the hospital emergency room, "as foggy as she was she snapped out of it, she would not sign herself in and she would have signed herself out immediately." According to the nephew, "[a]ll [Ms. Conroy and her sisters] wanted was to * * * have their bills paid and die in their own house." He also stated that he had refused to consent to the amputation of her gangrenous leg in 1982 and that he now sought removal of the nasogastric tube because, in his opinion, she would have refused the amputation and "would not have allowed [the nasogastric tube] to be inserted in the first place."

Ms. Conroy was a Roman Catholic. The Rev. Joseph Kukura, a Roman Catholic priest and an associate professor of Christian Ethics at the Immaculate Conception Seminary in Mahwah, New Jersey, testified that acceptable church teaching could be found in a document entitled "Declaration of Euthanasia" published by the Vatican Congregation for the Doctrine of the Faith, dated June 26, 1980. The test that this document espoused required a weighing of the burdens and the benefits to the patient of remaining alive with the aid of extraordinary life-sustaining medical treatment. Father Kukura said that life-sustaining procedures could be withdrawn if they were extraordinary, which he defined to embrace "all procedures, operations or other interventions which are excessively expensive, burdensome or inconvenient or which offer no hope of benefit to a patient." Here, he said, the hope of recovery and of returning to cognitive life, even with the nasogastric feeding, was not a reasonable possibility. The means of care were not adding to the value of her life, which was outweighed by the burdens of that life. He therefore considered the use of the nasogastric tube extraordinary. It was his judgment that removal of the tube would be ethical and moral, even though the ensuing period until her death would be painful.

The trial court decided to permit removal of the tube. 188 *N.J.Super.* 523, (Ch.Div.1983). It reasoned that the focus of

inquiry should be whether life has become impossibly and permanently burdensome to the patient. If so, the court held, prolonging life becomes pointless and perhaps cruel. It determined that removal of the tube would lead to death by starvation and dehydration within a few days, and that the death might be painful. Nevertheless, it found that Ms. Conroy's intellectual functioning had been permanently reduced to a very primative level, that her life had become impossibly and permanently burdensome, and that removal of the feeding tube should therefore be permitted.

The guardian *ad litem* appealed. While the appeal was pending, Ms. Conroy died with the nasogastric tube intact. Nevertheless, the Appellate Division decided to resolve the meritorious issues, finding that they were of significant public importance and that this type of case was capable of repetition but would evade review because the patients involved frequently die during litigation. 190 *N.J.Super.* 453, 459–60 (1983).

The Appellate Division viewed the ultimate question to be whether Claire Conroy's right of privacy outweighed the State's interest in preserving life. *Id.,* 190 *N.J.Super.* at 460. It held that the right to terminate life-sustaining treatment based on a guardian's judgment was limited to incurable and terminally ill patients who are brain dead, irreversibly comatose, or vegetative, and who would gain no medical benefit from continued treatment. *Id.,* 190 *N.J.Super.* at 466. As an alternative ground for its decision, it held that a guardian's decision may never be used to withhold nourishment, as opposed to the treatment or attempted curing of a disease, from an incompetent patient who is not comatose, brain dead, or vegetative, and whose death is not irreversibly imminent. *Id.,* 190 *N.J.Super.* at 469–70. Depriving a patient of a basic necessity of life, such as food, under those circumstances, the court stated, would hasten death rather than simply allow the illness to take its natural course. *Id.,* 190 *N.J.Super.* at 473. The court concluded that withdrawal of Ms. Conroy's nasogastric tube would be tantamount to killing her—not simply letting her die—and that such active euthanasia was

ethically impermissible. *Id.*, 190 *N.J.Super.* at 475. The Appellate Division therefore reversed the trial court's judgment.

We granted the guardian's petition for certification, 95 *N.J.* 195 (1983), despite Ms. Conroy's death, since we agree with the Appellate Division that the matter is of substantial importance and is capable of repetition but evades review. We permitted the participation as *amici curiae* of New Jersey Hospital Association; former Commissioners and professional staff members of the President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research; National Citizens' Coalition for Nursing Home Reform; John R. Connery, S.J., William E. May, William Smith, Benedict Ashley, O.P., the Student Ad Hoc Committee Against the War in Vietnam, and the New Jersey Concerned Taxpayers; The American Geriatrics Society; New Jersey Catholic Conference; New Jersey Right to Life Committee, Inc.; and Concern for Dying.

## II

This case requires us to determine the circumstances under which life-sustaining treatment may be withheld or withdrawn from an elderly nursing-home resident[1] who is suffering from serious and permanent mental and physical impairments, who will probably die within approximately one year even with the treatment, and who, though formerly competent, is now incompetent to make decisions about her life-sustaining treatment and is unlikely to regain such competence. Subsumed within this question are two corollary issues: what substantive guidelines are appropriate for making these treatment decisions for

---

[1] Our holding is restricted to nursing-home residents because they are governed by a number of state statutes that do not apply to elderly persons in other settings. *See infra*, at 377–381.

incompetent patients, and what procedures should be followed in making them.

A tragic situation like that of Claire Conroy raises profoundly disturbing questions that do not lend themselves to easy answers or ideal solutions. As scientific advances make it possible for us to live longer than ever before, even when most of our physical and mental capacities have been irrevocably lost, patients and their families are increasingly asserting a right to die a natural death without undue dependence on medical technology or unnecessarily protracted agony—in short, a right to "die with dignity." On the other hand, all persons have a fundamental right to expect that their lives will not be foreshortened against their will. The President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, an interdisciplinary group of ethicists, lawyers, doctors, theologians, and others established by Congress in 1978 to propose guidelines for resolving these and similar issues, stated the problem this way: "Once someone realizes that the time and manner of death are substantially under the control of medical science, he or she wants to be protected against decisions that make death too easy and quick as well as from those that make it too agonizing and prolonged." *President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Deciding to Forego Life-Sustaining Treatment* 23 (1983) [hereinafter cited as *President's Commission Report*].

Deciding on a course of treatment for an incompetent patient without impinging on either of these two interests is a difficult task. To err either way—to keep a person alive under circumstances under which he would rather have been allowed to die, or to allow that person to die when he would have chosen to cling to life—would be deeply unfortunate.

We thus approach this case with caution, conscious that life-and-death decisions like these are an awesome responsibility that can be undertaken only with a profound sense of humility

and reserve. The case of Claire Conroy raises moral, social, technological, philosophical, and legal questions involving the interplay of many disciplines. No one person or profession has all the answers.

Perhaps it would be best if the Legislature formulated clear standards for resolving requests to terminate life-sustaining treatment for incompetent patients.[2] As an elected body, the Legislature is better able than any other single institution to reflect the social values at stake. In addition, it has the resources and ability to synthesize vast quantities of data and opinions from a variety of fields and to formulate general guidelines that may be applicable to a broad range of situations. As the Florida Supreme Court said when faced with a similar issue:

> Because the issue with all its ramifications is fraught with complexity and encompasses the interests of the law, both civil and criminal, medical ethics and social morality, it is not one which is well-suited for resolution in an adversary judicial proceeding. It is the type [of] issue which is more suitably addressed in the legislative forum, where fact finding can be less confined and the view-

---

[2]Numerous bills dealing with determination of death and termination of life-sustaining treatment have been introduced into the State Senate and Assembly. *See* S–875, S–935, S–1050, A–182, A–269, A–524, and A–1165. The four Assembly bills, and one already passed by the Senate, S–1050, are now in the Assembly Judiciary Committee. One bill, S–875, is before the Senate Institutions, Health and Welfare Committee, and one, S–935, is before the Senate Judiciary Committee. We have been advised that the Assembly Judiciary Committee will commence discussions shortly on the various bills pending there and will attempt to put together a compromise bill or package of bills dealing with the subject.

There has also been legislative activity in a related area. A model health care consent act (A–932) is pending a vote in the Senate, having recently been released from committee. The bill would permit the appointment of a health care representative for persons incapable of consenting to health care on their own behalf. The bill does not, however, deal with decisions to withdraw or withhold life-sustaining treatment.

Finally, it should be noted that the National Conference of Commissioners on Uniform State Laws has submitted a proposed uniform act recognizing the enforceability of "living wills" in certain limited situations. That model legislation, entitled the Right to Decline Life-Sustaining Procedures Act, has not been formally adopted.

points of all interested institutions and disciplines can be presented and synthe-
sized. In this manner only can the subject be dealt with comprehensively and
the interests of all institutions and individuals be properly accommodated.
[*Satz v. Perlmutter*, 379 *So.*2d 359, 360 (Fla.1980), aff'g 362 *So.*2d 160 (Fla.
Dist.Ct.App.1978).]

*Accord In re Hamlin*, 102 *Wash.*2d 810, 821–22, 689 *P.*2d 1372,
1379 (1984).

We have had the benefit of some legislation in this state
concerning the rights of the institutionalized elderly. *See*
*N.J.S.A.* 30:13–1 to –11 and *N.J.S.A* 52:27G–1 to –16. The former
statute prescribes certain responsibilities of nursing homes and
rights of residents. The latter statute, discussed in detail *infra*
at pages 378–381, is directed to the protection of the civil and
human rights of the elderly confined to long-term care facilities
and similar institutions. However, neither statute provides spe-
cific guidelines concerning termination of life-sustaining treat-
ment.

Meanwhile, in the absence of specific legislation on the termi-
nation of life-sustaining treatment, we may not properly avoid
the issue that we have been asked to resolve merely because it
is troubling or difficult. Every day, and with limited legal
guidance, families and doctors are making decisions for patients
like Claire Conroy. *See* Howell, "Caretakers' Views on Respon-
sibilities for the Care of the Demented Elderly," 32(9) *J. Am.*
*Geriatrics Soc'y* 657, 658–59 (1984), and Hilfiker, "Sounding
Board: Allowing the Debilitated to Die," 308 *New Eng. J. Med.*
716 (1983) (describing wide variety of contexts in which health
care professionals may be forced to make such subjective
decisions for patients and their families). The courts, as guard-
ians of our personal rights, have a special responsibility to place
appropriate constraints on such private decision-making and to
create guideposts that will help protect people's interests in
determining the course of their own lives. *See Satz v. Perl-*
*mutter, supra,* 379 *So.*2d at 360–61. As we wrote in *In re*
*Quinlan,* 70 *N.J.* 10, 44, *cert.* denied *sub nom. Garger v. New*
*Jersey,* 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.*2d 289 (1976):
"[T]he law, equity and justice must not themselves quail and be

helpless in the face of modern technological marvels presenting questions hitherto unthought of."

### III

The starting point in analyzing whether life-sustaining treatment may be withheld or withdrawn from an incompetent patient is to determine what rights a competent patient has to accept or reject medical care. It is therefore necessary at the outset of this discussion to identify the nature and extent of a patient's rights that are implicated by such decisions.

The right of a person to control his own body is a basic societal concept, long recognized in the common law:

> No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. As well said by *Judge* Cooley, "The right to one's person may be said to be a right of complete immunity: to be let alone." Cooley on Torts, 29. [*Union Pac. Ry. Co. v. Botsford*, 141 *U.S.* 250, 251, 11 *S.Ct.* 1000, 1001, 35 *L.Ed.* 734, 737 (1891) (refusing to compel personal injury plaintiff to undergo pretrial medical examination).]

*Accord Perna v. Pirozzi*, 92 *N.J.* 446, 459–65 (1983). Judge Cardozo succinctly captured the essence of this theory as follows: "Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages." *Schloendorff v. Society of New York Hosp.*, 211 *N.Y.* 125, 129–30, 105 *N.E.* 92, 93 (1914).

The doctrine of informed consent is a primary means developed in the law to protect this personal interest in the integrity of one's body. "Under this doctrine, no medical procedure may be performed without a patient's consent, obtained after explanation of the nature of the treatment, substantial risks, and alternative therapies." Cantor, "A Patient's Decision to Decline Life-Saving Medical Treatment: Bodily Integrity Versus the Preservation of Life," 26 *Rutgers L.Rev.* 228, 237 (1973) (footnote omitted); *see also Perna v. Pirozzi, supra,* 92 *N.J.* at

461 ("Absent an emergency, patients have the right to determine not only whether surgery is to be performed on them, but who shall perform it.").

■ The doctrine of informed consent presupposes that the patient has the information necessary to evaluate the risks and benefits of all the available options and is competent to do so. *Cf.* Wanzer, Adelstein, Cranford, Federman, Hook, Moertel, Safar, Stone, Taussig & Van Eys, "The Physician's Responsibility Toward Hopelessly Ill Patients," 310 *New Eng. J. Med.* 955, 957 (1984) ("There are three basic prerequisites for informed consent: the patient must have the capacity to reason and make judgments, the decision must be made voluntarily and without coercion, and the patient must have a clear understanding of the risks and benefits of the proposed treatment alternatives or nontreatment, along with a full understanding of the nature of the disease and the prognosis."). In general, it is the doctor's role to provide the necessary medical facts and the patient's role to make the subjective treatment decision based on his understanding of those facts. *Cf.* Hilfiker, *supra*, 308 *New Eng. J. Med.* at 718 (acknowledging that "our ability [as doctors] to phrase options, stress information, and present our own advice gives us tremendous power").

■ The patient's ability to control his bodily integrity through informed consent is significant only when one recognizes that this right also encompasses a right to informed refusal. Note, "Informed Consent and the Dying Patient," 83 *Yale L.J.* 1632, 1648 (1974). Thus, a competent adult person generally has the right to decline to have any medical treatment initiated or continued. *See Superintendent of Belchertown State School v. Saikewicz,* 373 *Mass.* 728, 738, 370 *N.E.*2d 417, 424 (1977); *In re Quackenbush,* 156 *N.J.Super.* 282, 290 (Cty. Ct.1978); *cf. Bennan v. Parsonnet,* 83 *N.J.L.* 20, 22–23, 26–27 (Sup.Ct.1912) (acknowledging common-law rule that patient is "the final arbiter as to whether he shall take his chances with the operation or take his chances of living without it," but

holding that surgeon had implied consent while patient was unconscious to perform necessary surgical operation).

■ The right to make certain decisions concerning one's body is also protected by the federal constitutional right of privacy. The Supreme Court first articulated the right of privacy in *Griswold v. Connecticut*, 381 *U.S.* 479, 85 *S.Ct.* 1678, 14 *L.Ed.*2d 510 (1965), which held that married couples have a constitutional right to use contraceptives. The Court in *Roe v. Wade*, 410 *U.S.* 113, 93 *S.Ct.* 705, 35 *L.Ed.*2d 147 (1973), further extended its recognition of the privacy right to protect a woman's decision to abort a pregnancy although the woman's right to choose abortion directly conflicted with the state's legitimate and important interest in preserving the potentiality of fetal life. Finally, in *Quinlan, supra,* 70 *N.J.* at 40, we indicated that the right of privacy enunciated by the Supreme Court "is broad enough to encompass a patient's decision to decline medical treatment under certain circumstances," even if that decision might lead to the patient's death. *Accord Saikewicz, supra,* 373 *Mass.* at 738, 370 *N.E.*2d at 424; *Quackenbush, supra,* 156 *N.J.Super.* at 289–90. While this right of privacy might apply in a case such as this, we need not decide that issue since the right to decline medical treatment is, in any event, embraced within the common-law right to self-determination. *Accord In re Storar,* 52 *N.Y.*2d 363, 376–77, 420 *N.E.*2d 64, 70, 438 *N.Y.S.*2d 266, 272–73, *cert.* denied, 454 *U.S.* 858, 102 *S.Ct.* 309, 70 *L.Ed.*2d 153 (1981); Note, "Live or Let Die; Who Decides an Incompetent's Fate? *In re Storar* and *In re Eichner,*" 1982 *B.Y.U.L.Rev.* 387, 390–92.

■ Whether based on common-law doctrines or on constitutional theory, the right to decline life-sustaining medical treatment is not absolute. In some cases, it may yield to countervailing societal interests in sustaining the person's life. Courts and commentators have commonly identified four state interests that may limit a person's right to refuse medical treatment: preserving life, preventing suicide, safeguarding the

integrity of the medical profession, and protecting innocent third parties. *See, e.g., Satz v. Perlmutter, supra,* 362 *So.*2d at 162; *In re Spring,* 380 *Mass.* 629, 640, 405 *N.E.*2d 115, 123 (1980); *Commissioner of Correction v. Myers,* 379 *Mass.* 255, 261, 399 *N.E.*2d 452, 456 (1979); *Saikewicz, supra,* 373 *Mass.* at 728, 370 *N.E.*2d at 425; *In re Torres,* 357 *N.W.*2d 332, 339 (Minn.1984); *In re Colyer,* 99 *Wash.*2d 114, 121, 660 *P.*2d 738, 743 (1983); *President's Commission Report, supra,* at 31–32; Note, *"In re Storar:* The Right to Die and Incompetent Patients,"* 43 *U.Pitt.L.Rev.* 1087, 1092 (1982).

The state's interest in preserving life is commonly considered the most significant of the four state interests. *See, e.g., Spring, supra,* 380 *Mass.* at 633, 405 *N.E.*2d at 119; *Saikewicz, supra,* 373 *Mass.* at 740, 370 *N.E.*2d at 425; *President's Commission Report, supra,* at 32. It may be seen as embracing two separate but related concerns: an interest in preserving the life of the particular patient, and an interest in preserving the sanctity of all life. Cantor, *"Quinlan,* Privacy, and the Handling of Incompetent Dying Patients," 30 *Rutgers L.Rev.* 239, 249 (1977); *see* Annas, "In re Quinlan: Legal Comfort for Doctors," *Hastings Center Rep.,* June 1976, at 29.

 While both of these state interests in life are certainly strong, in themselves they will usually not foreclose a competent person from declining life-sustaining medical treatment for himself. This is because the life that the state is seeking to protect in such a situation is the life of the same person who has competently decided to forego the medical intervention; it is not some other actual or potential life that cannot adequately protect itself. *Cf. Roe v. Wade, supra,* 410 *U.S.* 113, 93 *S.Ct.* 705, 35 *L.Ed.*2d 147 (authorizing state restrictions or proscriptions of woman's right to abortion in final trimester of pregnancy to protect viable fetal life); *State v. Perricone,* 37 *N.J.* 463, *cert.* denied, 371 *U.S.* 890, 83 *S.Ct.* 189, 9 *L.Ed.*2d 124 (1962) (affirming trial court's appointment of guardian with authority to consent to blood transfusion for infant over parents' reli-

gious objections); *Muhlenberg Hosp. v. Patterson,* 128 *N.J.Super.* 498 (Law Div.1974) (authorizing blood transfusion to save infant's life over parents' religious objections).

In cases that do not involve the protection of the actual or potential life of someone other than the decisionmaker, the state's indirect and abstract interest in preserving the life of the competent patient generally gives way to the patient's much stronger personal interest in directing the course of his own life. *See, e.g., Quackenbush, supra,* 156 *N.J.Super.* at 290; Cantor, *supra,* 30 *Rutgers L.Rev.* at 249–50. Indeed, insofar as the "sanctity of individual free choice and self-determination [are] fundamental constituents of life," the value of life may be lessened rather than increased "by the failure to allow a competent human being the right of choice." *Saikewicz, supra,* 373 *Mass.* at 742, 370 *N.E.*2d at 426; *see also* Cantor, *supra,* 30 *Rutgers L.Rev.* at 250 ("Government tolerance of the choice to resist treatment reflects concern for individual self-determination, bodily integrity, and avoidance of suffering, rather than a deprecation of life's value.").

It may be contended that in conjunction with its general interest in preserving life, this state has a particular legislative policy of preventing suicide. *See N.J.S.A.* 30:4–26.3a (subjecting any person who attempts suicide to temporary hospitalization when the person's behavior suggests the existence of mental illness and constitutes a peril to life, person, or property); *see also N.J.S.A.* 2C:11–6 ("A person who purposely aids another to commit suicide is guilty of a crime of the second degree if his conduct causes such suicide or an attempted suicide, and otherwise of a crime of the fourth degree."). This state interest in protecting people from direct and purposeful self-destruction is motivated by, if not encompassed within, the state's more basic interest in preserving life. Thus, it is questionable whether it is a distinct state interest worthy of independent consideration.

In any event, declining life-sustaining medical treatment may not properly be viewed as an attempt to commit suicide.

Refusing medical intervention merely allows the disease to take its natural course; if death were eventually to occur, it would be the result, primarily, of the underlying disease, and not the result of a self-inflicted injury. *See Satz v. Perlmutter, supra,* 362 *So.*2d at 162; *Saikewicz, supra,* 373 *Mass.* at 743 n. 11, 370 *N.E.*2d at 426 n. 11; *Colyer, supra,* 99 *Wash.*2d at 121, 660 *P.*2d at 743; *see also President's Commission Report, supra,* at 38 (summarizing case law on the subject). *But cf. In re Caulk,* 125 *N.H.* 226, 230–232, 480 *A.*2d 93, 96–97 (1984) (stating that attempt of an otherwise healthy prisoner to starve himself to death because he preferred death to life in prison was tantamount to attempted suicide, and that the state, to prevent such suicide, could force him to eat). In addition, people who refuse life-sustaining medical treatment may not harbor a specific intent to die, *Saikewicz, supra,* 373 *Mass.* at 743, n. 11, 370 *N.E.*2d at 426 n. 11; rather, they may fervently wish to live, but to do so free of unwanted medical technology, surgery, or drugs, and without protracted suffering, *see Satz v. Perlmutter, supra,* 362 *So.*2d at 162–63 ("The testimony of Mr. Perlmutter * * * is that he really wants to live, but [to] do so, God and Mother Nature willing, under his own power.").

Recognizing the right of a terminally ill person to reject medical treatment respects that person's intent, not to die, but to suspend medical intervention at a point consonant with the "individual's view respecting a personally preferred manner of concluding life." Note, "The Tragic Choice: Termination of Care for Patients in a Permanent Vegetative State," 51 *N.Y.U. L.Rev.* 285, 310 (1976). The difference is between self-infliction or self-destruction and self-determination. *See* Byrn, "Compulsory Lifesaving Treatment for the Competent Adult," 44 *Fordham L.Rev.* 1, 16–23 (1975). To the extent that our decision in *John F. Kennedy Memorial Hosp. v. Heston,* 58 *N.J.* 576, 581–82 (1971), implies the contrary, we now overrule it.

The third state interest that is frequently asserted as a limitation on a competent patient's right to refuse medical treatment is the interest in safeguarding the integrity of the

medical profession. This interest, like the interest in preventing suicide, is not particularly threatened by permitting competent patients to refuse life-sustaining medical treatment. Medical ethics do not require medical intervention in disease at all costs. As long ago as 1624, Francis Bacon wrote, "I esteem it the office of a physician not only to restore health, but to mitigate pain and dolours; and not only when such mitigation may conduce to recovery, but when it may serve to make a fair and easy passage." *F. Bacon, New Atlantis, quoted in* Mannes, "Euthanasia vs. The Right to Life," 27 *Baylor L.Rev.* 68, 69 (1975). More recently, we wrote in *Quinlan, supra,* 70 *N.J.* at 47, that modern-day "physicians distinguish between curing the ill and comforting and easing the dying; that they refuse to treat the curable as if they were dying or ought to die, and that they have sometimes refused to treat the hopeless and dying as if they were curable." Indeed, recent surveys have suggested that a majority of practicing doctors now approve of passive euthanasia and believe that it is being practiced by members of the profession. See sources cited in *Storar, supra,* 52 *N.Y.*2d at 385–386 n. 3, 420 *N.E.*2d at 75–76 n. 3, 438 *N.Y.S.*2d at 277–78 n. 3 (Jones, J., dissenting), and in Collester, "Death, Dying and the Law: A Prosecutorial View of the *Quinlan* Case," 30 *Rutgers L.Rev.* 304, n. 3, 312 & n. 27.

Moreover, even if doctors were exhorted to attempt to cure or sustain their patients under all circumstances, that moral and professional imperative, at least in cases of patients who were clearly competent, presumably would not require doctors to go beyond advising the patient of the risks of foregoing treatment and urging the patient to accept the medical intervention. *Storar, supra,* 52 *N.Y.*2d at 377, 420 *N.E.*2d at 71, 438 *N.Y.S.*2d at 273; *see Colyer, supra,* 99 *Wash.*2d at 121–23, 660 *P.*2d at 743–44, citing *Saikewicz, supra,* 373 *Mass.* at 743–44, 370 *N.E.*2d at 417. If the patient rejected the doctor's advice, the onus of that decision would rest on the patient, not the doctor. Indeed, if the patient's right to informed consent is to have any meaning at all, it must be accorded respect even when

it conflicts with the advice of the doctor or the values of the medical profession as a whole..

The fourth asserted state interest in overriding a patient's decision about his medical treatment is the interest in protecting innocent third parties who may be harmed by the patient's treatment decision. When the patient's exercise of his free choice could adversely and directly affect the health, safety, or security of others, the patient's right of self-determination must frequently give way. Thus, for example, courts have required competent adults to undergo medical procedures against their will if necessary to protect the public health, *Jacobson v. Massachusetts,* 197 *U.S.* 11, 25 *S.Ct.* 358, 49 *L.Ed.* 643 (1905) (recognizing enforceability of compulsory smallpox vaccination law); to prevent a serious risk to prison security, *Myers, supra,* 379 *Mass.* at 263, 265, 399 *N.E.*2d at 457, 458 (compelling prisoner with kidney disease to submit to dialysis over his protest rather than acquiescing in his demand to be transferred to a lower-security prison); *accord Caulk, supra,* 125 *N.H.* at 230–231, 480 *A.*2d at 96; or to prevent the emotional and financial abandonment of the patient's minor children, *Application of President & Directors of Georgetown College, Inc.,* 331 *F.*2d 1000, 1008 (D.C.Cir.), *cert.* denied, 377 *U.S.* 978, 84 *S.Ct.* 1883, 12 *L.Ed.*2d 746 (1964) (ordering mother of seven-month-old infant to submit to blood transfusion over her religious objections because of the mother's "responsibility to the community to care for her infant"); *Holmes v. Silver Cross Hosp.,* 340 *F.Supp.* 125, 130 (N.D.Ill.1972) (indicating that patient's status as father of minor child might justify authorizing blood transfusion to save his life despite his religious objections).

■ On balance, the right to self-determination ordinarily outweighs any countervailing state interests, and competent persons generally are permitted to refuse medical treatment, even at the risk of death. Most of the cases that have held otherwise, unless they involved the interest in protecting innocent third parties, have concerned the patient's competency to

make a rational and considered choice of treatment. *See* Annot., 93 *A.L.R.*3d 67, at 80–85 (1979) ("Patient's Right to Refuse Treatment Allegedly Necessary to Sustain Life"). For example, in *Heston, supra,* 58 *N.J.* 576, this Court approved a blood transfusion to save the life of a twenty-two-year-old Jehovah's Witness who had been severely injured and was rushed to the hospital for treatment, despite the fact that a tenet of her faith forbade blood transfusions. The evidence indicated that she was in shock on admittance to the hospital and was then or soon became disoriented and incoherent. Part of the Court's rationale was that hospitals, upon which patients' care is thrust, "exist to aid the sick and the injured," *id.* 58 *N.J.* at 582, and that it is difficult for them to assess a patient's intent in an emergency and to determine whether a desire to refuse treatment is firmly and competently held, *id.* 58 *N.J.* at 581, 582. Similarly, courts in other states have authorized blood transfusions over the objections of Jehovah's Witnesses when the patient's opposition to the treatment was expressed in equivocal terms. *Compare Georgetown College, supra,* 331 *F.*2d at 1006–07 (authorizing transfusion to save life of patient who said that for religious reasons she would not consent to the transfusion, but who seemed to indicate that she would not oppose the transfusion if court ordered it since it would not then be her responsibility), *and United States v. George,* 239 *F.Supp.* 752, 753 (D.Conn.1965) (transfusion was authorized for patient who told court that he would not agree to the transfusion, but volunteered that if the court ordered it he would not resist in any way since it would be the court's will and not his), *with In re Osborne,* 294 *A.*2d 372, 374, 375 (D.C.1972) (stating that guardian should not be appointed to consent to transfusion on behalf of man who told court that he would be deprived of "everlasting life" if compelled by a court to submit to the transfusion, and who explained, "it is between me and Jehovah; not the courts.... I'm willing to take my chances. My faith is that strong.").

In view of the case law, we have no doubt that Ms. Conroy, if competent to make the decision and if resolute in her determination, could have chosen to have her nasogastric tube withdrawn. Her interest in freedom from nonconsensual invasion of her bodily integrity would outweigh any state interest in preserving life or in safeguarding the integrity of the medical profession. In addition, rejecting her artificial means of feeding would not constitute attempted suicide, as the decision would probably be based on a wish to be free of medical intervention rather than a specific intent to die, and her death would result, if at all, from her underlying medical condition, which included her inability to swallow. Finally, removal of her feeding tube would not create a public health or safety hazard, nor would her death leave any minor dependents without care or support.

It should be noted that if she were competent, Ms. Conroy's right to self-determination would not be affected by her medical condition or prognosis. Our Legislature has recognized that an institutionalized, elderly person, whatever his physical and mental limitations and life expectancy, has the same right to receive medical treatment as a competent young person whose physical functioning is basically intact. *See* *N.J.S.A.* 52:27G–1 (declaring "that it is the public policy of this State to secure for elderly patients, residents and clients of health care facilities serving their specialized needs and problems, *the same civil and human rights guaranteed to all citizens* ") (emphasis added). Moreover, a young, generally healthy person, if competent, has the same right to decline life-saving medical treatment as a competent elderly person who is terminally ill. Of course, a patient's decision to accept or reject medical treatment may be influenced by his medical condition, treatment, and prognosis; nevertheless, a competent person's common-law and constitutional rights do not depend on the quality or value of his life.

## IV

More difficult questions arise in the context of patients who, like Claire Conroy, are incompetent to make particular treatment decisions for themselves. Such patients are unable to exercise directly their own right to accept or refuse medical treatment. In attempting to exercise that right on their behalf, substitute decision-makers must seek to respect simultaneously both aspects of the patient's right to self-determination—the right to live, and the right, in some cases, to die of natural causes without medical intervention.

### A.

Discussion of the appropriateness of withholding or withdrawing life-sustaining treatment from an incompetent person must commence with an analysis of *In re Quinlan, supra,* 70 *N.J.* 10. In that case the father of Karen Ann Quinlan, a twenty-two-year-old woman, sought to be appointed her guardian and to be authorized to disconnect a respirator that was believed to be sustaining her life. Ms. Quinlan had been totally unconscious, unaware of anyone or anything around her, since one night in 1975, when she had sustained sudden and severe neurological damage of uncertain etiology. The consensus of the medical experts was that she was in a comatose or vegetative state and that her coma could appropriately be characterized as chronic and persistent, since no form of medical treatment could cure or improve it.

Although Ms. Quinlan's cognitive abilities had been irreversibly lost, only the more highly developed part of her brain had been destroyed, and she was therefore not "brain dead" under any of the criteria established by the Ad Hoc Committee of the Harvard Medical School.[3] Her brain stem,

---

[3]Whole brain death, as defined by the Ad Hoc Committee or other reliable medical criteria, is equivalent to the actual death of the person. See discussion in *Quinlan, supra,* 70 *N.J.* at 24, 27–28; *State v. Watson,* 191 *N.J.Super.* 464, 466

which controlled her body temperature, breathing, heart rate, chewing, swallowing, sleeping, waking, and similar physiological functions, was still biologically alive. Ms. Quinlan was therefore able to exist at a primitive reflex level, and to exhibit such reactions as blinking her eyes and reacting to light, sound, and noxious (painful) stimuli. She also grimaced, made stereotyped cries and sounds, and had chewing motions. The quality of her "feeling impulses" was not known.

Because her neurological condition had affected her respiratory function, Ms. Quinlan had been placed on a respirator, a machine that delivered a given volume of air at a certain rate and that periodically provided a relatively large volume of air designed to purge her lungs. She was nourished by feeding through a nasogastric tube. The unanimous opinion of all the doctors was that Ms. Quinlan would die if the respirator were removed.

This Court approved the father's designation as guardian and authorized removal of the respirator on the condition that the rest of the family and the attending physicians concurred with his decision and that those physicians and an "Ethics Committee" (or, more accurately, a prognosis committee) in the hospital agreed "that there [was] no reasonable possibility of Karen's

---

(App.Div.) ("The 'brain death' suffered by the victim was death in fact and could have been so declared before the respirator was turned off."), certif. denied, 95 *N.J.* 230 (1983); *D. Meyers, Medico-Legal Implications of Death and Dying* 23–58 (1981); *D. Walton, Ethics of Withdrawal of Life-Support Systems: Case Studies on Decision Making in Intensive Care* 68–85 (1983). One medical rationale for equating full brain death with death is that "whole-brain death results in such irreversible fluctuations and disorganization of the human organism that irreversible destruction of the whole body by irreversible cardiac arrest will follow within a short period"—probably no more than a week. *D. Walton, supra,* at 97. A person suffering from an irreversible coma as a result of partial brain death is not considered dead, *id.* at 76–80, 96; *D. Meyers, supra,* at 27–28, since he still has some brain functioning, *D. Walton, supra,* at 79, 98–99; *D. Meyers, supra,* at 27–28, and irreversible destruction of his whole body is not certain to follow, *id.* at 80, 102–03; *D. Meyers, supra,* at 26.

ever emerging from her present comatose condition to a cognitive, sapient state." *Id.*, 70 *N.J.* at 55. It reasoned that Ms. Quinlan, if competent, would have had a fundamental right to decline such treatment. In the words of Chief Justice Hughes:

> We have no doubt, in these unhappy circumstances, that if Karen were herself miraculously lucid for an interval (not altering the existing prognosis of the condition to which she would soon return) and perceptive of her irreversible condition, she could effectively decide upon discontinuance of the life-support apparatus, even if it meant the prospect of natural death. [*Id.* 70 *N.J.* at 39.]

Though couched in constitutional terms of the right of privacy, *id.*, 70 *N.J.* at 39–40, the underlying concept was an individual's right to behave and act as he deems fit, provided that such behavior and activity do not conflict with the precepts of society.

Since Ms. Quinlan could not express her intent, the Court held that her father as guardian would be permitted to express her intent on her behalf upon a showing sufficient to demonstrate her wishes, provided that the decision that she would have made was also objectively reasonable. The Court explained:

> If a putative decision by Karen to permit this non-cognitive, vegetative existence to terminate by natural forces is regarded as a valuable incident of her right of privacy, as we believe it to be, then it should not be discarded solely on the basis that her condition prevents her conscious exercise of the choice. *The only practical way to prevent destruction of the right is to permit the guardian and family of Karen to render their best judgment, subject to the qualifications hereinafter stated, as to whether she would exercise it in these circumstances.* If their conclusion is in the affirmative this decision should be accepted by a society the overwhelming majority of whose members would, we think, in similar circumstances, exercise such a choice in the same way for themselves or for those closest to them. It is for this reason that we determine that Karen's right of privacy may be asserted in her behalf, in this respect, by her guardian and family under the particular circumstances presented by this record. [*Id.*, 70 *N.J.* at 41–42 (emphasis added).]

## B.

The *Quinlan* decision dealt with a special category of patients: those in a chronic, persistent vegetative or comatose

state.[4] In a footnote, the opinion left open the question whether the principles it enunciated might be applicable to incompetent patients in "other types of terminal medical situations * * *, not necessarily involving the hopeless loss of cognitive or sapient life." *Id.*, 70 *N.J.* at 54 n. 10. We now are faced with one such situation: that of elderly, formerly competent nursing-home residents who, unlike Karen Quinlan, are awake and conscious and can interact with their environment to a limited extent, but whose mental and physical functioning is severely and permanently impaired and whose life expectancy, even with the treatment, is relatively short. The capacities of such people, while significantly diminished, are not as limited as those of irreversibly comatose persons, and their deaths, while no longer distant, may not be imminent. Large numbers of aged, chronically ill, institutionalized persons fall within this general category.

Such people (like newborns, mentally retarded persons, permanently comatose individuals, and members of other groups with which this case does not deal) are unable to speak for themselves on life-and-death issues concerning their medical care. This does not mean, however, that they lack a right to self-determination. The right of an adult who, like Claire Conroy, was once competent, to determine the course of her

---

[4]At least one commentator has suggested that too much emphasis may have been placed in some cases on determining whether or not a patient is in a chronic, persistent vegetative or comatose state. *D. Walton, supra,* at 51–53, 79–80. According to Walton, there is no medical consensus as yet as to what constitutes a permanent vegetative state, *id.* at 52; that and similar phrases, he says, are imprecise umbrella expressions that may be used to refer to any one of a variety of forms or degrees of cerebral destruction, including cerebral death (destruction of both cerebral hemispheres), neocortical death (destruction of the cortical neurons bilaterally but not of the deep structures of the cerebrum, such as the thalamus and basal ganglia), and the apallic syndrome (destruction of the pallium, or the sheath or membrane over the cerebral hemispheres), *id.* at 51, 79. Even more importantly, he argues that physicians are unable to determine with medical certainty whether any such condition is irreversible. *Id.* at 51–52, 53; *accord President's Commission Report, supra,* at 176–77.

medical treatment remains intact even when she is no longer able to assert that right or to appreciate its effectuation. *John F. Kennedy Memorial Hosp., Inc. v. Bludworth,* 452 *So.*2d 921, 924 (Fla.1984). As one commentator has noted:

> Even if the patient becomes too insensate to appreciate the honoring of his or her choice, self-determination is important. After all, law respects testamentary dispositions even if the testator never views his gift being bestowed. [Cantor, *supra,* 30 *Rutgers L.Rev.* at 259.]

> \* \* \* \* \* \* \* \*

> Any other view would permit obliteration of an incompetent's panoply of rights merely because the patient could no longer sense the violation of those rights. [*Id.* at 252.]

▆▆ Since the condition of an incompetent patient makes it impossible to ascertain definitively his present desires, a third party acting on the patient's behalf often cannot say with confidence that his treatment decision for the patient will further rather than frustrate the patient's right to control his own body. *Cf.* Smith, *"In re Quinlan:* Defining the Basis for Terminating Life Support Under the Right of Privacy," 12 *Tulsa L.J.* 150, 161 (1976) (arguing that permitting a guardian to make personal medical decisions for an incompetent patient actually interferes with the patient's right of privacy). Nevertheless, the goal of decision-making for incompetent patients should be to determine and effectuate, insofar as possible, the decision that the patient would have made if competent. Ideally, both aspects of the patient's right to bodily integrity—the right to consent to medical intervention and the right to refuse it—should be respected.

▆▆ In light of these rights and concerns, we hold that life-sustaining treatment may be withheld or withdrawn from an incompetent patient when it is clear that the particular patient would have refused the treatment under the circumstances involved. The standard we are enunciating is a subjective one, consistent with the notion that the right that we are seeking to effectuate is a very personal right to control one's own life. The question is not what a reasonable or average

person would have chosen to do under the circumstances but what the particular patient would have done if able to choose for himself.

The patient may have expressed, in one or more ways, an intent not to have life-sustaining medical intervention. Such an intent might be embodied in a written document, or "living will," stating the person's desire not to have certain types of life-sustaining treatment administered under certain circumstances.[5] It might also be evidenced in an oral directive that the patient gave to a family member, friend, or health care provider. It might consist of a durable power of attorney or appointment of a proxy authorizing a particular person to make the decisions on the patient's behalf if he is no longer capable of making them for himself. *See N.J.S.A.* 46:2B–8 (providing that principal may confer authority on agent that is to be exercisable "notwithstanding later disability or incapacity of the principal at law or later uncertainty as to whether the principal is dead or alive"). It might take the form of reactions that the patient voiced regarding medical treatment administered to others. *See, e.g., Storar, supra,* 52 *N.Y.*2d 363, 420 *N.E.*2d 64, 438 *N.Y.S.*2d 266 (withdrawal of respirator was justified as an effectuation of patient's stated wishes when patient, as member of Catholic religious order, had stated more than once in formal discussions concerning the moral implications of the *Quinlan* case, most recently two months before he suffered cardiac arrest that left him in an irreversible coma, that he would not want extraordinary means used to keep him alive under similar circumstances).[6] It might also be deduced

---

[5]The Legislature has not enacted a statute recognizing the validity of living wills or prescribing the means to execute such wills. See *supra* at 15–16 note 2 for pending legislation. Whether or not they are legally binding, however, such advance directives are relevant evidence of the patient's intent. *John F. Kennedy Memorial Hosp., Inc. v. Bludworth,* 452 *So.*2d 921, 926 (Fla.1984).

[6]None of these forms of evidence need be excluded as hearsay from a court proceeding, if there be one, since oral and written expressions of a person's

from a person's religious beliefs and the tenets of that religion, *id.* at 378, 420 *N.E.*2d at 72, 438 *N.Y.S.*2d at 274, or from the patient's consistent pattern of conduct with respect to prior decisions about his own medical care. Of course, dealing with the matter in advance in some sort of thoughtful and explicit way is best for all concerned.

Any of the above types of evidence, and any other information bearing on the person's intent, may be appropriate aids in determining what course of treatment the patient would have wished to pursue. In this respect, we now believe that we were in error in *Quinlan, supra,* 70 *N.J.* at 21, 41, to disregard evidence of statements that Ms. Quinlan made to friends concerning artificial prolongation of the lives of others who were terminally ill. See criticism of this portion of *Quinlan* opinion in Collester, *supra,* 30 *Rutgers L.Rev.* at 318; Smith, *supra,* 12 *Tulsa L.J.* at 163; and *D. Meyers, supra,* at 282 n. 65. Such evidence is certainly relevant to shed light on whether the patient would have consented to the treatment if competent to make the decision.

Although all evidence tending to demonstrate a person's intent with respect to medical treatment should properly be considered by surrogate decision-makers, or by a court in the event of any judicial proceedings, the probative value of such evidence may vary depending on the remoteness, consistency, and thoughtfulness of the prior statements or actions and the maturity of the person at the time of the statements or acts. *Colyer, supra,* 99 *Wash.*2d at 131, 660 *P.*2d at 748. Thus, for example, an offhand remark about not wanting to live under

---

reactions or desires fit within the "existing state of mind" exception to the hearsay rule. *Evid.R.* 63(12); *see State v. Ready,* 78 *N.J.L.* 599, 609 (E. & A. 1910) (testator's oral statements admissible to show his testamentary design); *Woll v. Dugas,* 104 *N.J.Super.* 586, 592–93 (Ch.Div.1969) (decedent's statements to lawyer about testamentary intent may fall within "state of mind" exception to hearsay rule), aff'd, 112 *N.J.Super.* 366 (App.Div.1970); *D. Meyers, supra,* at 282 n. 65; *Smith, supra,* 12 *Tulsa L.J.* at 163.

certain circumstances made by a person when young and in the peak of health would not in itself constitute clear proof twenty years later that he would want life-sustaining treatment withheld under those circumstances. In contrast, a carefully considered position, especially if written, that a person had maintained over a number of years or that he had acted upon in comparable circumstances might be clear evidence of his intent.

Another factor that would affect the probative value of a person's prior statements of intent would be their specificity. Of course, no one can predict with accuracy the precise circumstances with which he ultimately might be faced. Nevertheless, any details about the level of impaired functioning and the forms of medical treatment that one would find tolerable should be incorporated into advance directives to enhance their later usefulness as evidence.

Medical evidence bearing on the patient's condition, treatment, and prognosis, like evidence of the patient's wishes, is an essential prerequisite to decision-making under the subjective test. The medical evidence must establish that the patient fits within the Claire Conroy pattern: an elderly, incompetent nursing-home resident with severe and permanent mental and physical impairments and a life expectancy of approximately one year or less. In addition, since the goal is to effectuate the patient's right of informed consent, the surrogate decision-maker must have at least as much medical information upon which to base his decision about what the patient would have chosen as one would expect a competent patient to have before consenting to or rejecting treatment. Such information might include evidence about the patient's present level of physical, sensory, emotional, and cognitive functioning; the degree of physical pain resulting from the medical condition, treatment, and termination of treatment, respectively; the degree of humiliation, dependence, and loss of dignity probably resulting from the condition and treatment; the life expectancy and prognosis for recovery with and without treatment; the various

treatment options; and the risks, side effects, and benefits of each of those options. Particular care should be taken not to base a decision on a premature diagnosis or prognosis. *See Colyer, supra,* 99 *Wash.*2d at 143–45, 660 *P.*2d at 754–55 (Dore, J., dissenting).

We recognize that for some incompetent patients it might be impossible to be clearly satisfied as to the patient's intent either to accept or reject the life-sustaining treatment. Many people may have spoken of their desires in general or casual terms,[7] or, indeed, never considered or resolved the issue at all. In such cases, a surrogate decision-maker cannot presume that treatment decisions made by a third party on the patient's behalf will further the patient's right to self-determination, since effectuating another person's right to self-determination presupposes that the substitute decision-maker knows what the person would have wanted. Thus, in the absence of adequate proof of the patient's wishes, it is naive to pretend that the right to self-determination serves as the basis for substituted decision-making. *See Storar, supra,* 52 *N.Y.*2d at 378–380, 420 *N.E.*2d at 72–73, 438 *N.Y.S.*2d at 274–75; Veatch, "An Ethical Framework for Terminal Care Decisions: A New Classification of Patients," 32(9) *J.Am. Geriatrics Soc'y* 665, 666 (1984).

We hesitate, however, to foreclose the possibility of humane actions, which may involve termination of life-sustaining treatment, for persons who never clearly expressed their desires about life-sustaining treatment but who are now suffering a prolonged and painful death. An incompetent, like a minor child, is a ward of the state, and the state's *parens*

---

[7]For example, someone may have said orally or in writing merely that he would not want to be "artificially sustained" by "heroic measures" if his condition was "hopeless," or that he would not want to have doctors apply life-sustaining procedures "that would serve only to artificially prolong the dying process" if he were "terminally ill." Such a general statement might not in itself provide clear guidance to a surrogate decision-maker in all situations. *See* Cantor, *supra,* 30 *Rutgers L.Rev.* at 262; Hilfiker, *supra,* 308 *New Eng.J. Med.* at 718.

*patriae* power supports the authority of its courts to allow decisions to be made for an incompetent that serve the incompetent's best interests, even if the person's wishes cannot be clearly established. This authority permits the state to authorize guardians to withhold or withdraw life-sustaining treatment from an incompetent patient if it is manifest that such action would further the patient's best interests in a narrow sense of the phrase, even though the subjective test that we articulated above may not be satisfied. We therefore hold that life-sustaining treatment may also be withheld or withdrawn from a patient in Claire Conroy's situation if either of two "best interests" tests—a limited-objective or a pure-objective test—is satisfied.

Under the limited-objective test, life-sustaining treatment may be withheld or withdrawn from a patient in Claire Conroy's situation when there is some trustworthy evidence that the patient would have refused the treatment, and the decision-maker is satisfied that it is clear that the burdens of the patient's continued life with the treatment outweigh the benefits of that life for him. By this we mean that the patient is suffering, and will continue to suffer throughout the expected duration of his life, unavoidable pain, and that the net burdens of his prolonged life (the pain and suffering of his life with the treatment less the amount and duration of pain that the patient would likely experience if the treatment were withdrawn) markedly outweigh any physical pleasure, emotional enjoyment, or intellectual satisfaction that the patient may still be able to derive from life. This limited-objective standard permits the termination of treatment for a patient who had not unequivocally expressed his desires before becoming incompetent, when it is clear that the treatment in question would merely prolong the patient's suffering.

Medical evidence will be essential to establish that the burdens of the treatment to the patient in terms of pain and suffering outweigh the benefits that the patient is experienc-

ing. The medical evidence should make it clear that the treatment would merely prolong the patient's suffering and not provide him with any net benefit. Information is particularly important with respect to the degree, expected duration, and constancy of pain with and without treatment, and the possibility that the pain could be reduced by drugs or other means short of terminating the life-sustaining treatment. The same types of medical evidence that are relevant to the subjective analysis, such as the patient's life expectancy, prognosis, level of functioning, degree of humiliation and dependency, and treatment options, should also be considered.

■ This limited-objective test also requires some trustworthy evidence that the patient would have wanted the treatment terminated. This evidence could take any one or more of the various forms appropriate to prove the patient's· intent under the subjective test. Evidence that, taken as a whole, would be too vague, casual, or remote to constitute the clear proof of the patient's subjective intent that is necessary to satisfy the subjective test—for example, informally expressed reactions to other people's medical conditions and treatment—might be sufficient to satisfy this prong of the limited-objective test.

■ In the absence of trustworthy evidence, or indeed any evidence at all, that the patient would have declined the treatment, life-sustaining treatment may still be withheld or withdrawn from a formerly competent person like Claire Conroy if a third, pure-objective test is satisfied. Under that test, as under the limited-objective test, the net burdens of the patient's life with the treatment should clearly and markedly outweigh the benefits that the patient derives from life. Further, the recurring, unavoidable and severe pain of the patient's life with the treatment should be such that the effect of administering life-sustaining treatment would be inhumane. Subjective evidence that the patient would not have wanted the treatment is not necessary under this pure-objective standard. Nevertheless, even in the context of severe pain, life-sustaining treat-

ment should not be withdrawn from an incompetent patient who had previously expressed a wish to be kept alive in spite of any pain that he might experience.

Although we are condoning a restricted evaluation of the nature of a patient's life in terms of pain, suffering, and possible enjoyment under the limited-objective and pure-objective tests, we expressly decline to authorize decision-making based on assessments of the personal worth or social utility of another's life, or the value of that life to others. We do not believe that it would be appropriate for a court to designate a person with the authority to determine that someone else's life is not worth living simply because, to that person, the patient's "quality of life" or value to society seems negligible. The mere fact that a patient's functioning is limited or his prognosis dim does not mean that he is not enjoying what remains of his life or that it is in his best interests to die. *But cf. In re Dinnerstein*, 6 *Mass.App.Ct.* 466, 473, 380 *N.E.*2d 134, 138 (1978) (indicating, in reference to possible resuscitation of half-paralyzed, elderly victim of Alzheimer's disease, that prolongation of life is not required if there is no hope of return to a "normal, integrated, functioning, cognitive existence"); *see also President's Commission Report, supra*, at 135 (endorsing termination of treatment whenever surrogate decision-maker in his discretion believes it is in the patient's best interests, defined broadly to "take into account such factors as the relief of suffering, the preservation or restoration of functioning, and the quality as well as the extent of life sustained"). More wide-ranging powers to make decisions about other people's lives, in our view, would create an intolerable risk for socially isolated and defenseless people suffering from physical or mental handicaps.

We are aware that it will frequently be difficult to conclude that the evidence is sufficient to justify termination of treatment under either of the "best interests" tests that we have described. Often, it is unclear whether and to what extent

a patient such as Claire Conroy is capable of, or is in fact, experiencing pain. Similarly, medical experts are often unable to determine with any degree of certainty the extent of a nonverbal person's intellectual functioning or the depth of his emotional life. When the evidence is insufficient to satisfy either the limited-objective or pure-objective standard, however, we cannot justify the termination of life-sustaining treatment as clearly furthering the best interests of a patient like Ms. Conroy.

The surrogate decision-maker should exercise extreme caution in determining the patient's intent and in evaluating medical evidence of the patient's pain and possible enjoyment, and should not approve withholding or withdrawing life-sustaining treatment unless he is manifestly satisfied that one of the three tests that we have outlined has been met. *Cf. In re Grady*, 85 *N.J.* 235, 266 (1981) (requiring that evidence be clear and convincing before a court would approve sterilization of an incompetent, mentally retarded adult). When evidence of a person's wishes or physical or mental condition is equivocal, it is best to err, if at all, in favor of preserving life. *See Osborne, supra*, 294 *A.*2d at 374 (stating in dictum that when a patient is "suffering impairment of capacity for choice, it may be better to give weight to the known instinct for survival"); Dyck, "Ethical Aspects of Care for the Dying Incompetent," 32(9) *J.Am. Geriatrics Soc'y* 661, 663 (1984) ("[S]ituations in which [decision-makers] are uncertain about what is best should be resolved in favor of extending life where possible."). Or, as one writer has said as a justification for requiring a high degree of safety and certainty of diagnosis in the determination of brain death: "[I]f there is a lot to lose by being wrong, it is generally better to stick to the safer, known way in the absence of the highest probability for proceeding otherwise." *D. Walton, Ethics of Withdrawal of Life-Support Systems: Case Studies on Decision Making in Intensive Care* 82 (1983).

## C.

 We emphasize that in making decisions whether to administer life-sustaining treatment to patients such as Claire Conroy, the primary focus should be the patient's desires and experience of pain and enjoyment—not the type of treatment involved. Thus, we reject the distinction that some have made between actively hastening death by terminating treatment and passively allowing a person to die of a disease as one of limited use in a legal analysis of such a decision-making situation.

Characterizing conduct as active or passive is often an elusive notion, even outside the context of medical decision-making.

Saint Anselm of Canterbury was fond of citing the trickiness of the distinction between "to do" (*facere*) and "not to do" (*non facere*). In answer to the question "What's he doing?" we say "He's just sitting there" (positive), really meaning something negative: "He's not doing anything at all." [*D. Walton, supra,* at 234 (footnote omitted).]

The distinction is particularly nebulous, however, in the context of decisions whether to withhold or withdraw life-sustaining treatment. In a case like that of Claire Conroy, for example, would a physician who discontinued nasogastric feeding be actively causing her death by removing her primary source of nutrients; or would he merely be omitting to continue the artificial form of treatment, thus passively allowing her medical condition, which includes her inability to swallow, to take its natural course? *See President's Commission Report, supra,* at 65–66. The ambiguity inherent in this distinction is further heightened when one performs an act within an over-all plan of non-intervention, such as when a doctor writes an order not to resuscitate a patient. *Id.* at 67.

Consequently, merely determining whether what was done involved a fatal act or omission does not establish whether it was morally acceptable. * * * [In fact, a]ctive steps to terminate life-sustaining interventions may be permitted, indeed required, by the patient's authority to forego therapy even when such steps lead to death. [*President's Commission Report, supra,* at 67, 72.]

 For a similar reason, we also reject any distinction between withholding and withdrawing life-sustaining treatment. Some commentators have suggested that discontinuing life-sustaining treatment once it has been commenced is morally

more problematic than merely failing to begin the treatment. *See* Clouser, "Allowing or Causing: Another Look," 87 *Annals Internal Med.* 622, 624 (1977) ("To stop [therapy] * * * seems different in principle from refusing to initiate a therapy in response to a new crisis."). Discontinuing life-sustaining treatment, to some, is an "active" taking of life, as opposed to the more "passive" act of omitting the treatment in the first instance. In the words of one writer, "[T]he difference between taking away that which one has come to count on as normal support for life and not instituting therapy when a new crisis begins * * * fits nicely a basic moral distinction throughout life—we are not morally obligated to help another person, but we are morally obligated not to interfere with his life-sustaining routines." *Id.*

This distinction is more psychologically compelling than logically sound. As mentioned above, the line between active and passive conduct in the context of medical decisions is far too nebulous to constitute a principled basis for decisionmaking. Whether necessary treatment is withheld at the outset or withdrawn later on, the consequence—the patient's death—is the same. Moreover, from a policy standpoint, it might well be unwise to forbid persons from discontinuing a treatment under circumstances in which the treatment could permissibly be withheld. Such a rule could discourage families and doctors from even attempting certain types of care and could thereby force them into hasty and premature decisions to allow a patient to die. *See* Lynn & Childress, "Must Patients Always Be Given Food and Water?," 13 *Hastings Center Rep.* 17, 19–20 (1983).

■ We also find unpersuasive the distinction relied upon by some courts, commentators, and theologians between "ordinary" treatment, which they would always require, and "extraordinary" treatment, which they deem optional. *See generally Barber v. Superior Court,* 147 *Cal.App.*3d 1006, 1018, 195 *Cal.Rptr.* 484, 491 (1983); *D. Walton, supra,* at 222–28; *Sacred Congregation for the Doctrine of the Faith,* "Declaration

on Euthanasia" (official declaration of the Roman Catholic Church, approved by Pope John Paul II on May 5, 1980) [hereinafter cited as "Declaration on Euthanasia"], reprinted in *President's Commission Report, supra,* at 300–07. The terms "ordinary" and "extraordinary" have assumed too many conflicting meanings to remain useful. To draw a line on this basis for determining whether treatment should be given leads to a semantical milieu that does not advance the analysis. *See President's Commission Report, supra,* at 87.

The distinction between ordinary and extraordinary treatment is frequently phrased as one between common and unusual, or simple and complex, treatment, *President's Commission Report, supra,* at 84; "extraordinary" treatment also has been equated with elaborate, artificial, heroic, aggressive, expensive, or highly involved or invasive forms of medical intervention, *id.* at 84; *D. Walton, supra,* at 222–23. Depending on the definitions applied, a particular treatment for a given patient may be considered both ordinary and extraordinary. *President's Commission Report, supra,* at 84. Further, since the common/unusual and simple/complex distinctions among medical treatments "exist on continuums with no precise dividing line," *ibid.,* and the continuum is constantly shifting due to progress in medical care, disagreement will often exist about whether a particular treatment is ordinary or extraordinary. In addition, the competent patient generally could refuse even ordinary treatment; therefore, an incompetent patient theoretically should also be able to make such a choice when the surrogate decision-making is effectuating the patient's subjective intent. In such cases, the ordinary/extraordinary distinction is irrelevant except insofar as the particular patient would have made the distinction.

The ordinary/extraordinary distinction has also been discussed in terms of the benefits and burdens of treatment for the patient. If the benefits of the treatment outweigh the burdens it imposes on the patient, it is characterized as ordinary and therefore ethically required; if not, it is characterized as

extraordinary and therefore optional. *See President's Commission Report, supra,* at 84–85 & n. 122; "Declaration on Euthanasia," *supra.* This formulation is extremely fact-sensitive and would lead to different classifications of the same treatment in different situations. Thus, for example, we stated in *Quinlan, supra,* 70 *N.J.* at 48: "[T]he use of the same respirator or like support could be considered 'ordinary' in the context of the possibly curable patient but 'extraordinary' in the context of the forced sustaining by cardio-respiratory processes of an irreversibly doomed patient." Moreover, while the analysis may be useful in weighing the implications of the specific treatment for the patient, essentially it merely restates the question: whether the burdens of a treatment so clearly outweigh its benefits to the patient that continued treatment would be inhumane. As the President's Commission noted: "The claim, then, that the treatment is extraordinary is more of an expression of the conclusion than a justification for it." *President's Commission Report, supra,* at 88.

Some commentators, as indeed did the Appellate Division here, 190 *N.J.Super.* at 473, have made yet a fourth distinction, between the termination of artificial feedings and the termination of other forms of life-sustaining medical treatment. *See, e.g., E. Healy, Medical Ethics* 66 (1956); *J. Piccione, Last Rights: Treatment and Care Issues in Medical Ethics* 23, 38 (1984). According to the Appellate Division:

> If, as here, the patient is not comatose and does not face imminent and inevitable death, nourishment accomplishes the substantial benefit of sustaining life until the illness takes its natural course. Under such circumstances nourishment always will be an essential element of ordinary care which physicians are ethically obligated to provide. [190 *N.J.Super.* at 473.]

Certainly, feeding has an emotional significance. As infants we could breathe without assistance, but we were dependent on others for our lifeline of nourishment. Even more, feeding is an expression of nurturing and caring, certainly for infants and children, and in many cases for adults as well.

Once one enters the realm of complex, high-technology medical care, it is hard to shed the "emotional symbolism" of food.

*See Barber, supra,* 147 *Cal.App.*3d at 1016, 195 *Cal.Rptr.* at 490. However, artificial feedings such as nasogastric tubes, gastrostomies, and intravenous infusions are significantly different from bottle-feeding or spoonfeeding—they are medical procedures with inherent risks and possible side effects, instituted by skilled health-care providers to compensate for impaired physical functioning. Analytically, artificial feeding by means of a nasogastric tube or intravenous infusion can be seen as equivalent to artificial breathing by means of a respirator. Both prolong life through mechanical means when the body is no longer able to perform a vital bodily function on its own. *Ibid.*

Furthermore, while nasogastric feeding and other medical procedures to ensure nutrition and hydration are usually well tolerated, they are not free from risks or burdens; they have complications that are sometimes serious and distressing to the patient. *Caulk, supra,* 125 *N.H.* at 235–236, 480 *A.*2d at 99 (Douglas, J., dissenting); Lo & Dornbrand, "Sounding Board: Guiding the Hand that Feeds: Caring for the Demented Elderly," 311 *New Eng.J.Med.* 402, 403 (1984); Lynn & Childress, *supra,* 13 *Hastings Center Rep.* at 18, 20; Paris & Fletcher, "Infant Doe Regulations and the Absolute Requirement to Use Nourishment and Fluids for the Dying Infant," 11 *Law, Med. & Health Care* 210, 211–13 (1983); Zerwekh, "The Dehydration Question," 13 *Nursing 83* 47, 49 (1983). Nasogastric tubes may lead to pneumonia, cause irritation and discomfort, and require arm restraints for an incompetent patient. Lo & Dornbrand, *supra,* 311 *New Eng.J.Med.* at 403; Lynn & Childress, *supra,* 13 *Hastings Center Rep.* at 17–18. The volume of fluid needed to carry nutrients itself is sometimes harmful. Zerwekh, *supra,* 13 *Nursing 83* at 51.

Finally, dehydration may well not be distressing or painful to a dying patient. For patients who are unable to sense hunger and thirst, withholding of feeding devices such as nasogastric tubes may not result in more pain than the termination of any

other medical treatment. *See* Lynn & Childress, *supra*, 13 *Hastings Center Rep.* at 19, 20; Paris & Fletcher, *supra*, 11 *Law, Med. & Health Care* at 211. Indeed, it has been observed that patients near death who are not receiving nourishment may be more comfortable than patients in comparable conditions who are being fed and hydrated artifically. *See* Zerwekh, *supra*, 13 *Nursing 83* at 51; Lynn & Childress, *supra*, 13 *Hastings Center Rep.* at 19. Thus, it cannot be assumed that it will always be beneficial for an incompetent patient to receive artificial feeding or harmful for him not to receive it. *See* Wanzer, Adelstein, Cranford, Federman, Hook, Moertel, Safar, Stone, Taussig & Van Eys, *supra*, 310 *New Eng.J.Med.* at 959 ("If [a severely and irreversibly demented] patient rejects food and water by mouth, it is ethically permissible to withhold nutrition and hydration artifically administered by vein or gastric tube. Spoon feeding should be continued if needed for comfort.").

Under the analysis articulated above, withdrawal or withholding of artificial feeding, like any other medical treatment, would be permissible if there is sufficient proof to satisfy the subjective, limited-objective, or pure-objective test. A competent patient has the right to decline any medical treatment, including artificial feeding, and should retain that right when and if he becomes incompetent. In addition, in the case of an incompetent patient who has given little or no trustworthy indication of an intent to decline treatment and for whom it becomes necessary to engage in balancing under the limited-objective or pure-objective test, the pain and invasiveness of an artificial feeding device, and the pain of withdrawing that device, should be treated just like the results of administering or withholding any other medical treatment.

V

A.

The decision-making procedure for comatose, vegetative patients suggested in *Quinlan*, namely, the concurrence of

the guardian, family, attending physician, and hospital progno-sis committee, is not entirely appropriate for patients such as Claire Conroy, who are confined to nursing homes. There are significant differences in the patients, the health-care providers, and the institutional structures of nursing homes and hospitals.

First, residents of nursing homes are a particularly vulnera-ble population. Nursing-home residents are often quite elderly, with an average age of eighty-two nation-wide. *Subcomm. on Long-Term Care of the Special Comm. on Aging, United States Senate Nursing Home Care in the United States: Failure in Public Policy, Introductory Report, S.Rep.* No. 1420, 93d Cong., 2d Sess. 16 (1974) [hereinafter cited as *Senate Report on Aging*]. Most suffer from chronic or crippling disabilities and mental impairments, and need assistance in activities of daily living. *Id.* at 17. The vast majority of patients who enter a nursing home will eventually die there, *id.* at 16–17, and their illnesses and deaths will be viewed as consistent with their advanced age and general infirmity.

Second, nursing-home residents are often without any surviv-ing family. More than half have no surviving parents, siblings, or children. Their social isolation is severe. Many never have visits from anyone and few ever spend nights away except for medical reasons. *Id.* at 16, 18. Thus, the involvement of caring family members that was an integral part of the deci-sion-making process in *Quinlan* may not be a realistic possibili-ty for many nursing-home residents.

Third, physicians play a much more limited role in nursing homes than in hospitals. The Subcommittee on Long-Term Care of the Senate Special Committee on Aging states that physicians visit their patients in nursing homes infrequently, and then for only brief periods of time. *Senate Report on Aging, supra, Supporting Paper No. 3, Doctors in Nursing Homes: The Shunned Responsibility* 323–24 (1975). Accord-ing to the Subcommittee, physicians avoid nursing homes be-cause of the general shortage of physicians, the low priority for

elderly citizens in medical education, the red tape and low reimbursement associated with Medicare and Medicaid, the shortage of trained "backup" personnel in nursing homes, the emphasis on acute care in American medicine, the depressing environment in many nursing homes, and the disincentives of time and travel. *Id.* at 325–31. The "missing physician" is the general rule in nursing homes. *B. Vladeck, Unloving Care: The Nursing Home Tragedy* 17 (1980). The Conroy case is an example. Ms. Conroy's attending physician visited Ms. Conroy only about once a month. Moreover, physicians caring for nursing home residents generally are not chosen by the residents and are not familiar with their personalities and preferences. Besdine, "Decisions to Withhold Treatment from Nursing Home Residents," 31 *J.Am. Geriatrics Soc'y* 602, 603 (1983).

Fourth, nursing homes as institutions suffer from peculiar industry-wide problems to which hospitals are less prone. Ideally, "[c]are for older persons in need of long-term attention should be one of the most tender and effective services a society can offer to its people." *Senate Report on Aging, supra,* at iv. Indeed,

> the best of nursing home leaders have helped develop vitally needed new methods of care and concern for the elderly, and * * * —day in and day out—underpaid, but compassionate, aides in many homes attempt to provide a touch of humanity and tender care to patients who, though mute or confused and helpless, nevertheless feel and appreciate kindness and skill. [*Id.* at iii.]

Despite those worthwhile ideals, however, the Senate Subcommittee has referred to long-term care for older people as perhaps "the most troubled, and troublesome, component of our entire health care system." *Ibid.* According to the Subcommittee:

> In many cases [nursing home residents] have not even received humane treatment. And in an alarming number of known cases, they have actually encountered abuse and physical danger * * *. [*Id.* at 1–2.] [S]ubcommittee transcripts are replete with examples of cruelty, negligence, danger from fires, food poisoning, virulent infections, lack of human dignity, callousness and unnecessary regimentation, and kickbacks to nursing home operators from

suppliers. [*Id.* at 7.] The net impact is that far too many patients have needlessly sustained injury and, in some cases, death. [*Id.* at 2.]

Few nursing homes, in any event, have "ethics" or "prognosis" committees to review the attending doctor's assessment of a patient's prognosis.

Finally, nursing homes generally are not faced with the need to make decisions about a patient's medical care with the same speed that is necessary in hospitals. Hospitals are called upon for urgent care, and treatment decisions in that context must be made quickly. Nursing homes, in contrast, care for individuals whose lives are slowly declining and for whom treatment issues arise more gradually and are foreseeable longer in advance.

## B.

Despite the universality of the aging process, our society has generally been reluctant to confront the consequences of human aging. *New Jersey Governor's Conference on Aging, Report and Recommendations Toward an Aging Policy Today, Tomorrow, Together* 45 (1981) [hereinafter cited as *Report and Recommendations*]. New Jersey, however, has been at the forefront of efforts to deal constructively with its elderly citizens and their families. In 1957, it became the first state in the nation to establish an office, the New Jersey Division on Aging, devoted solely to the needs of the elderly. *Governor's Conference on Aging, Today, Tomorrow, Together* 3 (1981) [hereinafter cited as *Today, Tomorrow, Together*]. Since then, it has continued its efforts to meet the needs of this group. *See Report and Recommendations; Today, Tomorrow, Together.*

In 1976, the Legislature attempted to ameliorate the harsh conditions of the elderly in nursing homes by enacting an "Act concerning the responsibilities of nursing homes and the rights of nursing home residents," *N.J.S.A.* 30:13–1 to –11, which imposed certain minimal requirements on providers of nursing-home care. The Act charges nursing homes with numerous

responsibilities, such as ensuring that admission is limited to only that number of residents for which "it can safely and adequately provide nursing care" and that physical restraints and drugs are not used for purposes of punishment or for the convenience of nursing-home personnel. *N.J.S.A.* 30:13–3c, –3e, and –3f. The Act also delineates certain rights of residents, among them a right of privacy, a right to "considerate and respectful care that recognizes the dignity and individuality of the resident," and a right "[n]ot [to] be deprived of any constitutional, civil or legal right solely by reason of admission to a nursing home." *N.J.S.A.* 30:13–5f, –5j, and –5m.[8]

More recently, the Legislature determined that an additional program was required to safeguard the rights of the institutionalized elderly. It recognized that elderly residents of long-term and chronic-care facilities, including nursing homes, constituted a unique population whose members' rights may be difficult to secure, "since such persons may be afflicted with physical and mental infirmities, deprived of the comfort and counsel of family and friends, and forced to exist with minimum economic resources, all of which may preclude them from defending and acting in their own best interests * * *." *N.J. S.A.* 52:27G–1. Accordingly, the Legislature proclaimed that

---

[8]Other responsibilities of nursing homes under the Act include the responsibility to maintain a detailed account of residents' funds and property; to prohibit discrimination with respect to participation in social functions; to permit unlimited visits by clergy; and to permit citizens, legal services programs, and representatives of the Department of Public Advocate and of the Office of the Nursing Home Ombudsman Program of the Department of Community Affairs free access to the nursing home to advise residents of their rights. *N.J.S.A.* 30:13–3a, –3b, –3d, and –3g. Additional enumerated rights of residents include the rights to manage their own financial affairs, to retain and use their personal property, to wear their own clothing, to receive and send mail unopened, to have unaccompanied access to a telephone, to retain the services of their own personal physicians, to enjoy unrestricted visitation at any reasonable hour, and to present grievances to the nursing-home administrator without threat of reprisal. *N.J.S.A.* 30:13–5a, –5b, –5c, –5d, –5e, –5g, –5h, and –5i.

it is the public policy of this State to secure for elderly patients, residents and clients of health care facilities serving their specialized needs and problems, the same civil and human rights guaranteed to all citizens; and that to this end there should be established as an agency of the State Government the Office of the Ombudsman for the Institutionalized Elderly, to receive, investigate and resolve complaints concerning certain health care facilities serving the elderly, and to initiate actions to secure, preserve and promote the health, safety and welfare, and the civil and human rights, of the elderly patients, residents and clients of such facilities. [*Id.*]

In 1983, the statute was amended to address even more specific problems of the institutionalized elderly. The amendment charges the Office of the Ombudsman for the Institutionalized Elderly with the responsibility to guard against "abuse" of such elderly patients. "Abuse" is defined as

the willful infliction of physical pain, injury or mental anguish, unreasonable confinement; or, the *willful deprivation of services which are necessary to maintain a person's physical and mental health.* However, no person shall be deemed to be abused for the sole reason he is being furnished nonmedical remedial treatment by spiritual means through prayer alone in accordance with a recognized religious method of healing in lieu of medical treatment. [*N.J.S.A.* 52:27G–2a (emphasis added).]

Governor Kean explained the purpose and reason for the amendment when he signed it:

There have been unfortunate incidents in the past in which elderly patients in certain institutions or care facilities have been subjected to either physical or mental abuses * * *. These incidents have either gone unreported or came to light many months later when it was too late to take official action. [The amendment would provide] protection for the patient and comfort for the patient's family that he or she was receiving adequate care and was not being subjected to abuse of any kind.

The new provisions regarding abuse of the elderly create a vehicle for safeguarding the rights of elderly, institutionalized, incompetent patients both to receive medical treatment and to refuse life-sustaining medical treatment under certain circumstances. Upon receipt of notice of possible abuse of an elderly, institutionalized person, the ombudsman must conduct a prompt and thorough investigation that includes a visit to the elderly person and consultation with others who have knowledge of the particular case. *N.J.S.A.* 52:27G–7.2. Under its investigatory authority, the ombudsman may also make whatever inquiries he finds necessary, hold public or private hearings, subpoena wit-

nesses, and compel the production of records and other evidence. *N.J.S.A.* 52:27G–8. Furthermore, the ombudsman has the power to hire consultants and experts as he deems necessary. *N.J.S.A.* 52:27G–5b. Within twenty-four hours after first hearing of the possible abuse, the ombudsman must notify the Commissioner of Human Services and any other governmental agency that regulates or operates the facility.[9] *N.J.S.A.* 52:27G–7.2a. At the completion of the investigation, the Commissioner must be given a written report of the findings and recommendations. *N.J.S.A.* 52:27G–7.2b. Finally, "[i]f a determination is made that an elderly person may have been criminally abused or exploited, the ombudsman shall refer such findings, in writing, to the county prosecutor." *N.J.S.A.* 52:27G–7.2d.

Our decision allowing life-sustaining medical treatment to be withheld or withdrawn under certain circumstances from institutionalized, elderly patients does not conflict with *N.J.S.A.* 52:27G–1 to –16. With regard to health care services, the statute defines "abuse" as "the willful deprivation of services which are necessary to maintain a person's physical and mental health." *N.J.S.A.* 52:27G–2a. As commonly used, "deprivation" means taking something from a person or preventing him from getting it. If, after a fully informed consent, a competent elderly person decided to forego medical treatment, health care providers acting in accordance with those wishes would not be "willfully depriving" the person of medical services. Comply-

---

[9]*N.J.S.A.* 52:27G–2f defines "facility" as

any facility or institution, whether public or private, offering health or health related services for the institutionalized elderly, and which is subject to regulation, visitation, inspection, or supervision by any government agency. Facilities include, but are not limited to, nursing homes, skilled nursing homes, intermediate care facilities, extended care facilities, convalescent homes, rehabilitation centers, residential health care facilities, special hospitals, veterans hospitals, chronic disease hospitals, psychiatric hospitals, mental hospitals, mental retardation centers or facilities, day care facilities for the elderly, and medical day care centers.

ing with the previously expressed wishes of a now-incompetent patient pursuant to a subjective standard of decision-making would similarly be effectuating that person's right to self-determination. On the other hand, if an institutionalized, elderly person had not clearly expressed his wishes before becoming incompetent but the burdens of the patient's continued existence with the treatment so clearly outweighed its benefits that the limited-objective or pure-objective test had been satisfied, administering the treatment would only prolong the patient's suffering, and terminating the treatment would therefore be in the patient's best interests. In that situation, withholding or withdrawing treatment can be seen not as an intentional, wrongful act to harm the patient, but as conduct motivated by a concern for the patient's pain. Accordingly, such a termination may not fairly be characterized as a "willful deprivation of services."

## C.

Because of the special vulnerability of mentally and physically impaired, elderly persons in nursing homes and the potential for abuse with unsupervised institutional decision-making in such homes, life-sustaining treatment should not be withdrawn or withheld from a nursing-home resident like Claire Conroy in the absence of a guardian's decision, made in accordance with the procedure outlined below, that the elements of the subjective, limited-objective, or pure-objective test have been satisfied. A necessary prerequisite to surrogate decision-making is a judicial determination that the patient is incompetent to make the decision for himself and designation of a guardian for the incompetent patient if he does not already have one.

Substitute decision-making by a guardian is not permissible unless the patient has been proven incompetent to make the particular medical treatment decision at issue. *See* Veatch, "An Ethical Framework for Terminal Care Decisions: A New Classification of Patients," 32(9) *J. Am. Geriatrics Soc'y* 665, 668 (1984) ("[O]ne cannot simply presume that a patient is

incompetent. There must be some sort of due process, and if the patient has not been adjudicated to be incompetent, he must be treated as * * * competent * * *."). A patient may be incompetent because he lacks the ability to understand the information conveyed, to evaluate the options, or to communicate a decision. Medical evidence bearing on these capabilities should be furnished to a court by at least two doctors with expertise in relevant fields who have personally examined the patient. *See R.* 4:83–2(b). The proof must be clear and convincing that the patient does not have and will not regain the capability of making the decision for himself. *Cf. Grady, supra,* 85 *N.J.* at 265 (requiring clear and convincing proof of incompetence of mentally retarded adult before allowing guardian to consent to sterilization of such incompetent person).

Determining whether the patient is competent to make the medical decision at issue is necessary even if the patient previously had been adjudicated an incompetent and had a general guardian appointed pursuant to. *N.J.S.A.* 3B:12–25. Here, for example, the plaintiff, Mr. Whittemore, had been appointed Ms. Conroy's guardian in 1979, when she entered the nursing home, at which time she was still lucid sporadically and could speak. That designation was made pursuant to Rule 4:83, which requires medical proof that "the alleged incompetent is unfit and unable to govern himself and to manage his affairs." *R.* 4:83–2(b); *see also N.J.S.A.* 3B:12–25 (providing that the Superior Court may determine "mental incompetency" and "appoint a guardian" for the incompetent's person and estate). Such a general appointment does not necessarily mean that the incompetent cannot make an informed judgment regarding a particular medical treatment. *See Grady, supra,* 85 *N.J.* at 265 ("The fact that a person is legally incompetent for some purposes, *cf. R.* 4:83 (action for guardianship of incompetent), does not mean that he lacks the capacity to make a decision about sterilization."); *In re Schiller,* 148 *N.J.Super.* 168, 180–81 (Ch. 1977) (stating that test for mental capacity to consent to medical treatment is whether the patient has "sufficient mind to

reasonably understand the condition, the nature and effect of the proposed treatment, [and the] attendant risks in pursuing * * * and not pursuing the treatment"). The inability to "govern" one's self and manage one's other affairs does not necessarily preclude the ability to make a decision to forego further medical treatment.

█ If the patient already has a general guardian, the court should determine whether that guardian is a suitable person to represent the patient with respect to the medical decision in question. Such a determination necessitates an inquiry into the guardian's knowledge of the patient and motivations or possible conflicts of interest. If the patient, although incompetent to make the treatment decision for himself, does not yet have a guardian, a suitable person should be appointed as guardian for him.

█ We hold that to determine whether withholding or withdrawing life-sustaining treatment from an elderly nursing-home resident who is incompetent to make the decision for himself is justified under any of the three tests articulated above, the following procedure is required. A person who believes that withholding or withdrawing life-sustaining treatment would effectuate an incompetent patient's wishes or would be in his "best interests" should notify the Office of the Ombudsman of the contemplated action. Such notification may be undertaken by the patient's guardian, or by another interested party, such as a close family member, an attending physician, or the nursing home in which the patient resides. Any person who believes the contrary, that is, who has reasonable cause to suspect that withholding or withdrawing the life-sustaining treatment would be an abuse of that patient, should also report such information to the ombudsman.

We believe the ombudsman should be involved in the process at this stage. The ombudsman should treat every notification that life-sustaining treatment will be withheld or withdrawn from an institutionalized, elderly patient as a possible "abuse."

Under *N.J.S.A.* 52:27G–7.2a, the ombudsman would then be required to investigate the situation and to report it within twenty-four hours to the Commissioner of Human Services and to any other government agency that regulates or operates the facility.

Evidence concerning the patient's condition should be furnished by the attending physician and nurses. Two other physicians, unaffiliated with the nursing home and with the attending physician, should then be appointed to confirm the patient's medical condition and prognosis. We recommend that the ombudsman exercise his discretionary authority under *N.J. S.A.* 52:27G–5b to appoint the physicians. In the event that the ombudsman chooses not to exercise his authority in this regard, application may be made to the assignment judge of the appropriate vicinage for designation of the two physicians. Depending upon the circumstances of a particular case, the physicians may be compensated by the patient's estate, the guardian, the family, or the nursing home. If the funds from these sources are insufficient, the guardian may seek reimbursement from the ombudsman or possibly from Medicare.

Provided that the two physicians supply the necessary medical foundation, the guardian, with the concurrence of the attending physician,[10] may withhold or withdraw life-sustaining medical treatment if he believes in good faith, based on the medical evidence and any evidence of the patient's wishes, that it is clear that the subjective, limited-objective, or pure-objective test is satisfied. In addition, the ombudsman must concur in that decision. This role would be consonant with his legislative responsibilities. Finally, if the limited-objective or pure-objective test is being used, the family—that is, the patient's spouse, parents, and children, or, in their absence, the patient's next of

---

[10]*See Quinlan, supra,* 70 *N.J.* at 54 (authorizing the guardian to replace the attending physician with one whose views may be different).

kin, if any—must also concur in the decision to withhold or withdraw life-sustaining treatment.

In the absence of bad faith, no participant in the decision-making process shall be civilly or criminally liable for actions taken in accordance with the procedures set forth in this opinion. *Cf. Quinlan, supra,* 70 *N.J.* at 54 (providing for complete civil and criminal immunity for guardians, physicians, hospitals, and others, who, after complying with the procedures articulated in *Quinlan,* participate in a decision to withhold life support treatment). However, the decision-making procedure that we have outlined does not necessarily immunize its participants entirely from judicial oversight. As previously noted, the ombudsman can refer cases of questionable criminal abuse to the county prosecutor. *N.J.S.A.* 52:27G–7.2d.

## VI

As noted above, *supra* at 381, the guardian will resolve the issues in these matters and make the ultimate decision with such concurrences as we have required. Ordinarily, court involvement will be limited to the determination of incompetency, and the appointment of a guardian unless a personal guardian has been previously appointed, who will determine whether the standards we have prescribed have been satisfied. The record in this case did not satisfy those standards. The evidence that Claire Conroy would have refused the treatment, although sufficient to meet the lower showing of intent required under the limited-objective test, was certainly not the "clear" showing of intent contemplated under the subjective test. More information should, if possible, have been obtained by the guardian with respect to Ms. Conroy's intent. What were her ethical, moral, and religious beliefs? She did try to refuse initial hospitalization, and indeed had "scorned medicine." 188 *N.J.Super.* at 525. However, she allowed her nephew's wife, a registered nurse, to care for her during several illnesses. It was not clear whether Ms. Conroy permit-

ted the niece to administer any drugs or other forms of medical treatment to her during these illnesses. Although it may often prove difficult, and at times impossible, to ascertain a person's wishes, the Conroy case illustrates the sources to which the guardian might turn. For example, in more than eight decades of life in the same house, it is possible that she revealed to persons other than her nephew her feelings regarding medical treatments, other values, and her goals in life. Some promising avenues for such an inquiry about her personal values included her response to the illnesses and deaths of her sisters and others, and her statements with respect to not wanting to be in a nursing home.

Moreover, there was insufficient information concerning the benefits and burdens of Ms. Conroy's life to satisfy either the limited-objective or pure-objective test. Although the treating doctor and the guardian's expert testified as to Claire Conroy's condition, neither testified conclusively as to whether she was in pain or was capable of experiencing pain or thirst. There was medical agreement that removal of the tube would have caused pain during the period of approximately one week that would have elapsed before her death, or at least until she were to lapse into a coma. On the other hand, there was little, if any, evidence of the discomfort, suffering, and pain she would endure if she continued to be fed and medicated through the tube during her remaining life—contemplated to be up to one year. Apparently her feedings sometimes occasioned moaning, but it remains unclear whether these were reflex responses or expressions of discomfort. Moreover, although she tried to remove the tube, it is not clear that this was intentional, and there was little evidence that she was in distress. Her treating physician also offered contradictory views as to whether the contractures of her legs caused pain or whether, indeed, they might be the result of pain, without offering any evidence on that issue. The trial court rejected as superfluous the offer to present as an expert witness a neurologist, who might have been able to explain what Ms. Conroy's

reactions to the environment indicated about her perception of pain.

The evidence was also unclear with respect to Ms. Conroy's capacity to feel pleasure, another issue as to which the information supplied by a neurologist might have been helpful. What was known of her awareness of the world? Although Ms. Conroy had some ability to smile and scratch, the relationship of these activities to external stimuli apparently was quite variable.

The trial transcript reveals no exploration of the discomfort and risks that attend nasogastric feedings. A casual mention by the nurse/administrator of the need to restrain the patient to prevent the removal of the tube was not followed by an assessment of the detrimental impact, if any, of those restraints. Alternative modalities, including gastrostomies, intravenous feeding, subcutaneous or intramuscular hydration, or some combination, were not investigated. Neither of the expert witnesses presented empirical evidence regarding the treatment options for such a patient.

It can be seen that the evidence at trial was inadequate to satisfy the subjective, the limited-objective, or the pure-objective standard that we have set forth. Were Claire Conroy still alive, the guardian would have been required to explore these issues prior to reaching any decision. Guardians—and courts, if they are involved—should act cautiously and deliberately in deciding these cases. The consequences are most serious—life or death.

We have not attempted to set forth guidelines for decision-making with respect to life-sustaining treatment in a variety of other situations that are not currently before us. Innumerable variations are possible. However, each case—such as that of the severely deformed newborn, of the never-competent adult suffering from a painful and debilitating illness, and of the mentally alert quadriplegic who has given up on life—poses its own unique difficulties. We do not deem it advisable to at-

tempt to resolve all such human dilemmas in the context of this case. It is preferable, in our view, to move slowly and to gain experience in this highly sensitive field. As we noted previously, the Legislature is better equipped than we to develop and frame a comprehensive plan for resolving these problems.

The judgment of the Appellate Division is reversed. In light of Ms. Conroy's death, we do not remand the matter for further proceedings.

HANDLER, J., concurring in part and dissenting in part.

When this case first reached us it presented the fate of an aged nursing home patient close to death and unconscious. Claire Conroy's physical condition had deteriorated so much that she was totally dependent upon a nasogastric tube for essential nutriment, medication, and fluids. Her guardian, a nephew, sought to have the nasogastric tube removed and to allow her to die naturally. But Miss Conroy's attending physician refused to remove this device. The guardian then sought judicial authorization for another doctor to remove the tube, but before the courts could finally act upon this request, Miss Conroy died.

Although the case became technically moot upon Miss Conroy's death, we decided to resolve the issues raised by Miss Conroy's guardian. We do so for sound reasons. This case exemplifies the terrible, constantly recurring life-or-death decision that confronts scores of individuals; the standards appropriate to guide judgments in making this kind of decision are confused and unsettled, posing real risks of improvident actions with incalculable and irremediable consequences; the record in this case adequately presents sufficient information to enable us to address most important concerns; and our disposition can furnish a springboard for appropriate and more comprehensive treatment of these problems by the Legislature. Perhaps most important, this decision may encourage individuals to use living wills.

The Court introduces its main discussion of the case with this observation, *viz:*

> [P]atients and their families are increasingly asserting a right to die a natural death without undue dependence on medical technology or unnecessarily protracted agony—in short, a right to "die with dignity." On the other hand, all persons have a fundamental right to expect that their lives will not be foreshortened against their will.
>
> * * * * * * * *
>
> Deciding on a course of treatment for an incompetent patient without impinging on either of these two interests is a difficult task. To err either way—to keep a person alive under circumstances under which he would rather have been allowed to die, or to allow that person to die when he would have chosen to cling to life—would be deeply unfortunate. [*Ante* at 343–344.]

I agree with the Court's articulation of this profound moral conundrum. It captures the heart of the problem. My disagreement is with the Court's resolution as it relates to persons like Miss Conroy.

Like many other nursing home residents, Miss Conroy became incompetent and unconscious without ever having expressed her views regarding when, if ever, to forego treatment that might prolong her life. Thus the Court's endorsement of a living will and its formulation of a "subjective test" that embodies the concept underlying a living will, *ante* at 360–363, can have no application to her. Therefore the Court develops two additional standards to govern the decision whether to terminate life-prolonging treatment on behalf of such incompetent, isolated, and soon-to-die nursing home residents whose preferences cannot be ascertained by using a living will concept as incorporated in a "subjective test."

With respect to some of these nursing home residents, according to the Court, "there is some trustworthy evidence that the patient would have refused the treatment...." *Ante* at 365–366. As to such a person the Court would apply a "limited-objective test" to determine whether life-support treatment should be discontinued to allow death to occur without external interference. Under the limited-objective test the decision-maker must balance the "burdens of ·the treatment to the

patient in terms of pain and suffering" against the "benefits
that the patient is experiencing." *Id.* at 365. This means,
according to the Court,

> that the patient is suffering, and will continue to suffer throughout the
> expected duration of his life, *unavoidable pain*, and that the net burdens of his
> prolonged life (the pain and suffering of his life with the treatment less the
> amount and duration of pain that the patient would likely experience if the
> treatment were withdrawn) markedly outweigh any physical pleasure, emotion-
> al enjoyment, or intellectual satisfaction that the patient may still be able to
> derive from life. [*Ante* at 365 (emphasis added).]

In determining whether this test is satisfied in a given situa-
tion, medical evidence is required to show "that the treatment
would merely prolong the patient's suffering and not provide
him with any net benefit." *Id.*

There are other nursing home residents facing imminent
death for whom there is *no* available reliable evidence of their
previous views regarding the cessation of life-prolonging treat-
ment. For such persons the test prescribed by the Court to
determine when such treatment may be withdrawn is labelled a
"pure-objective test." *Ante* at 365. Under this test the Court
requires "recurring unavoidable and severe pain" before treat-
ment may be stopped. *Id.* at 367. The Court implicitly
requires medical evidence to support a conclusion that drugs
and other therapy could not reduce pain. *See id.*

The present record suggests that Miss Conroy would exempli-
fy this latter class of persons, that is, persons who had not in
the past reliably indicated their views concerning the termina-
tion of life-prolonging procedures. Compare *ante* at 385 (sug-
gesting that additional proofs might serve to place Miss Conroy
in the intermediate category.) Thus no one knew if she would
have wanted to forego the treatment that she was receiving in
the nursing home during 1983 shortly before her death. Her
nephew testified only that his aunt never saw a physician or
received medical treatment prior to becoming incompetent.
Further, she was alone; she had never married, her siblings

had all died, and she lived by herself. Her social isolation typifies many elderly nursing home residents. *Ante* at 375.

Understanding that there was no reliable way to divine Miss Conroy's possible wishes and recognizing the difficulty in evaluating her physical condition, the trial judge visited her bedside while she was living. He found that

> Claire Conroy suffers from severe organic brain syndrome, necrotic decubitus ulcers on her left foot, left leg and left hip, urinary tract infection, arteriosclerotic heart disease, hypertension and diabetes mellitus. Except for minor movements of her head, neck, arms and hands, she is unable to move. She does not speak. She lies in bed in a fetal position. She sometimes follows people with her eyes, but often simply stares blankly ahead. Her general physical appearance is very withered. [*In re Conroy,* 188 *N.J.Super.* 523, 524–25 (1983).]

He concluded that "[a]ll the testimony in the case and my own direct observation of the patient convince me that she has no cognitive or volitional functioning. There is no reasonable expectation that the patient's condition will ever improve." [*Id.* at 525.]

Further, evidence failed to prove that Miss Conroy experienced, or could possibly experience, pain. *Id.*

Given these facts, it appears that, under the Court's approach, the decision whether to withdraw life-sustaining procedures for Miss Conroy would be governed by the pure-objective test. In the final analysis, on the record before us, the application of this test, or for that matter, even the limited-objective test, would not have led to a more humane, dignified, and decent end of Claire Conroy's mortal life. She would have died, as she did, with the nasogastric tube still in her body.

I harbor the most serious doubts as to the justice, efficacy, or humaneness of a standard that would require a person to die in this fashion.[1] The Court should, therefore, formulate a standard that would, in these circumstances, permit a natural death

---

[1] Judge Stanton likewise concluded that "[i]f the patient's life has become impossibly and permanently burdensome, then we simply are not helping the patient by prolonging her life, and active treatment designed to prolong life becomes utterly pointless and probably cruel." 188 *N.J.Super.* at 528.

with dignity and compassion. Such a standard should not give determinative weight to the element of personal pain, which necessarily obviates other extremely important considerations. Rather it should accommodate as comprehensively, fairly, and realistically as possible all concerns and values that have a legitimate bearing on the decision whether to provide particular treatment at the very end of an individual's life.

## I

The legal issues in this case derive from a moral dilemma of an intensely and profoundly personal character. Unfortunately, in cases such as Miss Conroy's, individuals incapable of helping themselves must have the dilemma resolved by others. The Court properly recognizes that any decision must be made based on the individual's best interests, a collection of values that society will impute to incompetent persons who cannot express their own preferences. See *ante* at 365.

It is right for the Court to exercise its inherent *parens patriae* jurisdiction to determine the interests that are at stake in this litigation. This power derives from the sovereign's "inherent equitable authority ... to protect those persons within the state who cannot protect themselves because of an innate legal disability." *In re Grady,* 85 *N.J.* 235, 259 (1981).

It would be amiss, in the context relevant to Miss Conroy's situation, to stress notions of individual privacy or autonomy in measuring a person's best interests. Resorting to the values of individual privacy and autonomy in this setting cannot reveal the "true interests" of the incompetent person or effectuate any actual personal choice on her or his part. These individuals cannot presently choose. Further, by definition, they have never before reliably indicated their views or preferred choice in the matter. "What is really involved ... is not so much the incompetent's right to personal choice—nature has already deprived her of that—but rather what is in her best interests." *Grady, supra,* 85 *N.J.* at 274 (Handler, J. concurring). Hence,

reliance upon the concepts of personal privacy and individual autonomy cannot enhance the ability to make critical life-or-death decisions. Thus, when the court's jurisdiction is invoked in this setting, it is the fundamental interests of helpless persons that are at stake, and it becomes a judicial responsibility to intercede to preserve those interests under equitable principles.

In a recent California decision, the court properly recognized that it "would be derelict in [its] duties if [it] did not provide some general guidelines for future conduct in the absence of ... legislation" to protect the best interests of incompetent helpless, terminal individuals. *Barber v. Superior Court,* 147 *Cal.App.*3d 1006, 1019, 195 *Cal.Rptr.* 484, 491 (Cal.Ct.App.1983). The judicial task can be viewed as "establishing a framework in the law on which the activities of health care personnel and other persons" can be guided so as to act in the best interest of the patient. *Superintendent of Belchertown v. Saikewicz,* 373 *Mass.* 728, 736, 370 *N.E.*2d 417, 422–23 (1977); *see President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Deciding to Forego Life-Sustaining Treatment* 136 (1983) (hereinafter *President's Commission Report*). Because decisions of this type implicate so many interests, competing concerns and conflicting moral values, I fully endorse the Court's call for more comprehensive legislative treatment of this extraordinarily difficult and sensitive issue.

Absent legislative resolution of the matter, the judicial challenge remains. This Court must attempt to identify and define the nature of the interests of these helpless persons, to articulate guiding standards to preserve their interests, and to authorize a decision-making structure to assure sound determinations in accordance with such guidelines.

In my opinion, the Court's objective tests too narrowly define the interests of people like Miss Conroy. While the basic

standard purports to account for several concerns, it ultimately focuses on pain as the critical factor. The presence of significant pain in effect becomes the sole measure of such a person's best interests. "Pain" thus eclipses a whole cluster of other human values that have a proper place in the subtle weighing that will ultimately determine how life should end.

The Court's concentration on pain as the exclusive criterion in reaching the life-or-death decision in reality transmutes the best-interests determination into an exercise of avoidance and nullification rather than confrontation and fulfillment. In most cases the pain criterion will dictate that the decision be one not to withdraw life-prolonging treatment and not to allow death to occur naturally. First, pain will not be an operative factor in a great many cases. "[P]resently available drugs and techniques allow pain to be reduced to a level acceptable to virtually every patient, usually without unacceptable sedation." *President's Commission Report, supra,* at 50–51; *see id.* at 19 n. 19 *citing* Saunders, "Current Views on Pain Relief and Terminal Care" in *The Therapy of Pain* 215 (Swerdlow, ed. 1981) (a hospice reports complete control of pain in over 99% of its dying patients); *see generally id.* at 277–95; *see also generally The Management of Terminal Disease* (Saunders, ed. 1978); *The Experience of Dying* (Pattison, ed. 1977); *Psychopharmacologic Agents for the Terminally Ill and Bereaved* (Goldberg *et al.,* eds. 1973).[2] Further, as was true in Miss Conroy's case, health care providers frequently encounter difficulty in evaluat-

---

[2]As early as the mid-19th century physicians recognized their ability to do much good by a palliative course, by alleviating pain, procuring sleep, guarding the diet, regulating the alimentary canal—in fine, by obviating such sufferings as admit of mitigation ... Lastly, by a just prognosis ... we may sustain the patient and his friends during the inevitable course of the disease.

Jacob Bigelow, *Care in the Absence of Cure-1835, reprinted in* 85 *Annals Int. Med.* 825 (1976), *quoted in President's Commission Report, supra,* at 50 n. 23.

ing the degree of pain experienced by a patient.[3] Finally, "[o]nly a minority of patients—fewer than half of those with malignancies, for example—have substantial problems with pain...." *President's Commission Report, supra* at 278, *citing* Twycross, "Relief of Pain" in *The Management of Terminal Disease, supra,* at 66. Thus, in a great many cases, the pain test will become an absolute bar to the withdrawal of life-support therapy.

The pain requirement, as applied by the Court in its objective tests, effectively negates other highly relevant considerations that should appropriately bear on the decision to maintain or to withdraw life-prolonging treatment. The pain standard may dictate the decision to prolong life despite the presence of other factors that reasonably militate in favor of the termination of such procedures to allow a natural death. The exclusive pain criterion denies relief to that class of people who, at the very end of life, might strongly disapprove of an artificially extended existence in spite of the absence of pain. *See In re Torres,* 357 *N.W.* 332, 340 (Minn.1984) (although a patient "cannot feel pain," that patient may have a guardian petition to forego

---

[3]There are two kinds of pain, acute and chronic. Acute, or transient, pain constitutes our common experience. *See* Twycross, "Relief of Pain" in *The Management of Terminal Disease* 71 (Saunders, ed. 1978). It passes relatively quickly, *id.,* and usually can be treated simply and directly.

Chronic pain "wastes the patient's strength and resolve and destroys whatever value he or she could have found in living." *President's Commission Report, supra,* at 278. "Chronic pain is a situation rather than an event and it:
1. is impossible to predict when it will end;
2. usually gets worse rather than better;
3. lacks positive meaning;
4. frequently expands to occupy the patient's whole attention; and when this happens, life is no longer worth living."

Twycross, *supra,* at 71. Drug therapies to relieve chronic pain serve amidst several constraints. *See id.* at 72; *see also President's Commission Report* at 279, 283 (when treating chronic pain, health care providers should continuously administer drugs rather than cycling between painful and pain-free periods). "Fortunately, the chronic pain of dying patients is almost always fairly easy to control." *Id.* at 278.

life-sustaining treatment). Thus, some people abhor dependence on others as much, or more, than they fear pain. Other individuals value personal privacy and dignity, and prize independence from others when their personal needs and bodily functions are involved. Finally, the ideal of bodily integrity may become more important than simply prolonging life at its most rudimentary level. Persons, like Miss Conroy, "may well have wished to avoid ... '[t]he ultimate horror [not of] death but the possibility of being maintained in limbo, in a sterile room, by machines controlled by strangers.'" *In re Torres, supra,* 357 *N.W.*2d at 340, quoting Steel, "The Right to Die: New Options in California," 93 *Christian Century* [July-Dec. 1976].

Clearly, a decision to focus exclusively on pain as the single criterion ignores and devalues other important ideals regarding life and death. Consequently, a pain standard cannot serve as an indirect proxy for additional and significant concerns that bear on the decision to forego life-prolonging treatments.

## II

The *President's Commission Report* rejects an exclusive focus on patient pain primarily because pain can often be relieved. This Report suggests the following course of action to decide whether to forego life-prolonging treatment.

> In assessing whether a procedure or course of treatment would be in a patient's best interests, the surrogate must take into account such factors as the relief of suffering, the preservation or restoration of functioning, and the quality as well as the extent of life sustained. [*President's Commission Report* at 135 (footnote omitted).]

In considering the best interests of an incompetent patient, the California court in *Barber* approved this standard. 147 *Cal. App.*3d at 1022, 195 *Cal.Rptr.* at 493.

The Court implicitly criticizes the *President's Commission Report's* approach. It fears that the ability to " 'take into account such factors as the relief of suffering, the preservation or restoration of functioning, and the quality as well as the extent of life sustained' ... would create an intolerable risk for

socially isolated and defenseless people suffering from mental and physical handicaps." *Ante* at 367. The Court specifically eschews "decision-making based on assessments of the personal worth or social utility of another's life...." *Id.* Such analysis mischaracterizes the "quality of life" standard. Indeed, the *President's Commission Report, supra,* at 135 n. 43, expressly rejects any approach to resolving the difficult issue in cases like Miss Conroy's that would entail an evaluation of the social utility of another person's life.

I share the Court's discomfiture with a standard that does not attempt to identify reasonably verifiable measures of a person's quality of life. However, there is no intrinsic reason why a quality-of-life standard must remain any more vague and undefined than a standard that includes pain. The Court itself recognizes how a thorough medical investigation can be relied on to reveal information important in applying its subjective test.

> [The] information [gathered] might include evidence about the patient's present level of physical, sensory, emotional, and cognitive functioning; the degree of physical pain resulting from the medical condition, treatment, and termination of treatment, respectively; the degree of humiliation, dependence, and loss of dignity probably resulting from the condition and treatment; the life expectancy and prognosis for recovery with and without treatment; the various treatment options; and the risks, side effects, and benefits of each of those options. [*Id.*]

Indeed the Court notes that the same type of evidence is relevant to a determination under the limited-objective test. *Ante* at 366. The Court thus implicitly concedes that a test that does not rely principally on the presence of pain can entail a meticulous medical investigation and verification.

I would therefore have the Court adopt a test that does not rely exclusively on pain as the ultimately determinative criterion. Rather, the standard should consist of an array of factors to be medically established and then evaluated by the decision-maker both singly and collectively to reach a balance that will justify the determination whether to withdraw or to continue life-prolonging treatment. The withdrawal of life-prolonging treatment from an unconscious or comatose, terminally ill indi-

vidual near death, whose personal views concerning life-ending treatment cannot be ascertained, should be governed by such a standard.

Several important criteria bear on this critical determination. The person should be terminally ill and facing imminent death. There should also be present the permanent loss of conscious thought processes in the form of a comatose state or profound unconsciousness. Further, there should be the irreparable failure of at least one major and essential bodily organ or system. *See, e.g., In re Quinlan,* 70 *N.J.* 10 (1976) (respiratory system); *Barber, supra* (same); *In re Dinnerstein,* 6 *Mass.App.* 466, 380 *N.E.*2d 134 (1978) (heart); *Saikewicz, supra* (circulatory system); *Conroy, supra* (swallowing reflex); *Torres, supra* (cerebral cortex and brainstem); *In re Hamlin,* 102 *Wash.*2d 810, 689 *P.*2d 1372 (1984) (cerebral cortex). Obviously the presence or absence of significant pain is highly relevant.

In addition, the person's general physical condition must be of great concern. The presence of progressive, irreversible, extensive, and extreme physical deterioration, such as ulcers, lesions, gangrene, infection, incontinence and the like, which frequently afflict the bed-ridden, terminally ill, should be considered in the formulation of an appropriate standard.[4] The medical and nursing treatment of individuals *in extremis* and suffering from these conditions entails the constant and exten-

---

[4]The symptoms of physical deterioration may become more difficult to control as terminal illness progresses. In cases of terminal cancer, for example, several categories of changes are associated with the disease. *See generally* Calman, "Physical Aspects" in *The Management of Terminal Disease, supra,* at 39–43. These include: cachexia, a symptom complex associated with loss of weight, decreased body fat, protein, and carbohydrate, increased basal metabolic rate, and abnormal iron metabolism that leads patients to become weak and tired and to experience abnormal metabolic activity; malabsorption, as when cancer treatment may induce villous atrophy, impairing the body's ability to absorb nutrients, leading to symptoms such as vitamin deficiency, skin and mucosal lesions, anemia, and decreased responsiveness to drugs; influences of previous treatment, which may have decreased the ability of

sive handling and manipulation of the body. At some point, such a course of treatment upon the insensate patient is bound to touch the sensibilities of even the most detached observer. Eventually, pervasive bodily intrusions, even for the best motives, will arouse feelings akin to humiliation and mortification for the helpless patient. When cherished values of human dignity and personal privacy, which belong to every person living or dying, are sufficiently transgressed by what is being done to the individual, we should be ready to say: enough.

### III

In my view, our understanding as to how life should end must be infused with the fundamental human moral values that serve us while we live. As we have faced life, so should we be able to face death. When an individual's personal philosophy or moral values cannot otherwise be brought to bear to resolve the dilemma of whether to live or die, then factors that generally and normally shape basic human moral values should be taken into account. These factors should be assessed reasonably and fairly from the patient's perspective. They should be weighed and balanced by an appropriate, responsible surrogate decision-maker in reaching the final awesome decision whether to withdraw life-prolonging treatment from the unfortunate and hapless patient. I believe that a decision informed by these considerations would be conducive to the humane, dignified, and decent ending of life.

*For reversal*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, POLLOCK, O'HERN and GARIBALDI— 6.

*Dissenting in part; concurring in part*—Justice Handler— 1.

---

various body tissues to function; kidney and liver problems; hematological problems; biochemical changes; infection and impaired immune response; and a decreased ability to metabolize drugs. *Id.*