## DiVittore v. State Farm Mutual Automobile Insurance Company

*James L. Pannebaker*, for plaintiff.
*Richard H. Wix*, for defendant.

LIPSITT, *J.*, June 24, 1985—"Like a good neighbor, State Farm is there," proclaims the corporate

motto of defendant, State Farm Mutual Automobile Insurance Company. In this case, however, State Farm is here in court contesting the claim for "attendant care," brought on behalf of Holly DiVittore, plaintiff who sustained permanently damaging head trauma when she was hit by an automobile while jogging on the Capitol Campus of the Pennsylvania State University one evening in November of 1979. Following a non-jury trial in which a verdict was rendered for plaintiff, State Farm has moved for post-verdict relief.

The issue is a novel one arising under Pennsylvania's No-fault Motor Vehicle Insurance Act of July 19, 1974, P.L. 489, 40 P.S. §1009.101 et seq., repealed by the Act of Feburary 12, 1984, P.L. 26, 75 Pa.C.S. §1701 et seq. The question is whether "attendant care" (as further described herein) prescribed by a physician for the rehabilitation of a brain-injured patient is contemplated by the No-fault Act's definition of "medical and vocational rehabilitation services" in section 103, or whether such care is primarily custodial and therefore not the responsibility of State Farm. The full court unanimously agrees with the trial judge's conclusion that attendant care is rehabilitative and not merely custodial. Therefore, State Farm's motion will be denied and the verdict will be affirmed.

Holly DiVittore suffered a closed head injury, or cerebral concussion, and was diagnosed as having diffuse bilateral cerebral dysfunction with severe cognitive defects. As a result of the permanent organic damage to her brain, Holly is impaired in her selective attention to the basic task of independent living, and her performance of the activities of daily living is complicated by a lack of organization, with deficits in spatial orientation and short-term memory. Cognitive or intellectual skills and motor func-

tions together represent the area of greatest disability, and Holly needs structured verbal and written cues in order to carry out simple tasks such as preparing food.

Holly can carry out appropriate automatic activities in her home setting with the attendant care now provided by her mother and father, but she has very shallow recall of what she is doing and demonstrates a lack of insight into her condition, although she can verbalize somewhat about how she was before the accident, and it upsets her. She seems to require constant direction and prompting in order to perform even the simplest daily tasks, and therefore requires constant observation and reinforcement of her environment. Although Holly's compensating skills to adapt to the permanent damage have more or less plateaued, without significant change over six months, further therapy is prescibed as needed on all levels to maintain her *current* functioning and basic living skills. See Complaint, Exhibits C and F.

William M. Gibson, M.D. is the Executive Director of the Elizabethtown Hospital for Children and Youth, where he leads the Head Trauma Team which treated Holly DiVittore when she was transferred there in a partially comatose state. His team continued to follow her progress as an outpatient with active occupational and speech therapies directed at improvement of her language skills, organization of self-care tasks and identification of objects. As early as May of 1982, Doctor Gibson recommended, among other things, for Holly to move from the present dependence on her mother and to explore other community-based resources requires the employment of a trained attendant for medical rehabilitation. Such an individual is paramount if Holly is to remain at home and achieve

transition to a workshop setting. This person is also required to increase basic living skills where ultimately Holly would be able to function in a supervised or transitional living setting (e.g., group home or community-based apartment).

• • •

In summary, the extent of the residual disability secondary to the head trauma suffered by Holly DiVittore presents critical long-term management needs where both the clients' rights and the family rights should be considered in the decision process. Complaint, Exhibit C, pp. 4-5. Doctor Gibson also testified at trial, providing the medical background on which the court's findings are based, as well as the advocacy for the rights of the disabled which compels the court's conclusions.

State Farm's first argument, unsupported by any expert medical testimony, is that attendant-care services for Holly are not "necessary to reduce disability and to restore her physical, psychological, and vocational functioning," and therefore not compensable as "medical and vocational rehabilitation services" defined in section 103 of the No-fault Act. Much emphasis is placed on the fact that Holly's compensating skills to adapt to her disability have more or less plateaued, and the "slight improvement" in her condition from constant attendant care is said to be insufficient to qualify that care as medical and vocational rehabilitative services. Because Holly's physical, psychological, social and vocational functioning will never be restored to the point where she can become a self-supporting member of society, State Farm denies liability for attendant care. This argument is flawed in numerous respects.

Although the physical damage to Holly's brain tissue is permanent, and her compensating skills have

plateaued, it does not follow that attendant care will not contribute substantially to her rehabilitation by reducing her disability and restoring her functioning. As State Farm recognizes, there will be gradual and "small" or "slight" improvements in Holly's ability to function with attendant care, and the principal effect of that care will be to prevent her from regressing rapidly in her development to an infantile stage of performance. With constant structure and rehearsal provided by an attendant, the quality of Holly's life will continue to improve and she will be spared the vegetative existence of living in a cocoon that will undoubtedly follow if she is allowed to slide down the "mirror image" of her development curve.

Of course, Holly has received attendant care from her parents, working closely with the therapists at Elizabethtown Hospital under the direction of Doctor Gibson's Head Trauma Team, but the impact on the family as primary caregivers has been a considerable amount of emotional stress and a complete loss of time which the DiVittores once had to themselves. In ascertaining the legislative intent of the No-fault Act, the court is properly guided by an enlightened consideration of the fundamental human rights of Holly as distinct from those of her family. Such a holistic analysis of developmental disabilities has been explicitly recognized as our national policy. See 42 U.S.C. §§6000(b)(1), 6001(7), 6010. This view is also consistent with the policy of the No-fault Act to provide for the "maximum feasible restoration of all individuals injured . . . in motor vehicle accidents" so that Holly can "receive prompt and comprehensive professional treatment, and be rehabilitated to the point where she can return as a useful member of society and a self-respecting and

self-supporting citizen." 40 P.S. §§1009.102(a)(3) and (a)(9).

The Superior Court has ascribed a broad meaning to the term "rehabilitate": to restore to a condition of health or useful and constructive activity. Brenna v. Nationwide Insurance Co., 294 Pa. Super. 564, 571 n.2 440 A.2d 609 (1982). The Supreme Court has also recognized that rehabilitation "connotes methods aimed at restoration of function following an injury or disability whose effects have been stabilized," citing the technical definition of the term as "restoration to a disabled individual of *maximum independent commensurate with his limitations* by developing his residual capacities." Dragun v. Volk, 500 Pa. 613, 618 459 A.2d 333 (1983) (Emphasis supplied.) Other lexicons are in accord that rehabilitation is the "restoration of a disabled person to maximum self-sufficiency or capacity for gainful employment by special methods of training," and a "process of restoring to useful life a person who has been ill or who is handicapped. This is accomplished through education and therapy." Attorneys' Dictionary of Medicine (Schmidt ed. 1985), Taber's Cyclopedic Medical Dictionary (13th ed. 1977).

The basis on which State Farm seeks to avoid liability, for whatever reasons, is that the attendant would perform some incidental custodial or housekeeping functions in the course of providing the principal rehabilitative or programmatic care prescribed by Doctor Gibson. This assertion is simply incorrect. An attendant is an educator who takes on the instruction of rehabilitative activities which will help optimize the developmental return and independence of which Holly is capable, commensurate with her limitations. As a paramedical therapist professionally trained in the care of brain-trauma vic-

tims, the attendant must be able to direct, guide and bring out the client's demonstrated competency, rather than inflict themselves on the client. In an attempt to merge Holly with the society around her and achieve some semblance of normalcy in her lifestyle, the attendant cooperates closely with her family but does *not* perform their traditional housekeeping or custodial functions.

State Farm apparently stands alone (or in sparse company) in the insurance industry in its refusal to provide no-fault benefits for attendant care, at least according to Dr. Gibson and his staff. Based upon the uncontradicted evidence presented, that refusal is contrary to both the letter and spirit of the No-fault Act, and the court finds the attendant care prescribed for Holly DiVittore constitutes medical and vocational rehabilitative services necessary for reduction of her disability and restoration of her physical, psychological, social and vocational functioning to the maximum feasible extent. In view of the credentials of the Elizabethtown Hospital for Children and Youth, now a component of the College of Medicine of the Pennsylvania State University, the court further finds that facility to be accredited by the Department of Health as being in accordance with applicable requirements and regulations.

Moreover, pursuant to sections 404 and 405 of the No-fault Act, the court finds that the prescribed attendant care is recognized and medically acceptable, that it is reasonable and appropriate in this case, that it will contribute substantially to rehabilitation, and that its cost is reasonable in relation to its probable rehabilitative effects. Further, as of December 22, 1982, when the complaint was filed in this case, State Farm was on notice of the demand

for payment for attendant care, and such payments remain overdue, bearing interest at the rate of 18 percent pursuant to Section 106(a)(2) of the No-fault Act. Finally, in view of the quantum of evidence presented by plaintiff, and the lack of proof in support of State Farm's refusal to provide for attendant care, the court finds that refusal to be without reasonable foundation or articulation of any logical basis, and attorney's fees and costs are awarded pursuant to Section 107(3), in an amount to be determined by the court.

During the drafting of this opinion, Karen Quinlan died in a New Jersey nursing home after lying in a coma since April of 1975. Karen was at the center of the landmark "right to die" decision of In re Quinlan, 70 N.J. 10, 355 A.2d 647 (1976), recently updated by In re Conroy, 98 N.J. 321, 486 A.2d 1209 (1985). These cases examined the right of the terminally ill (and their guardians) to make certain decisions concerning their body by *declining* life-sustaining medical treatment.

In this case, the court is confronted with the implicit question of what *quality of life* Holly DiVittore would *choose*, and what sort of rehabilitative treatment her parents and guardians have a right to expect from State Farm after a negligent driver robbed her brain of some of its highest cognitive functions. While the "quality of life" may not be an appropriate basis for assessments and decisions by guardians of the dying, the court views the quality of Holly's life (and that of her parents) as a paramount consideration in awarding fair compensation for attendant care, which may in some measure restore the functions she has lost. See In re Conroy, 98 N.J. 321, ____, 486 A.2d 1209, 1232-33 (1985).

Accordingly, we enter the following

## ORDER

And now, this June 24, 1985, the motion for post-verdict relief filed on behalf of State Farm Mutual Automobile Insurance Company is denied, and the verdict of the court is affirmed.